UNITED STATES of America, Appellee,

v.

Charles F. BURKE, Jr., Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alan Peter QUIN, Defendant, Appellant.

Nos. 82–1550, 82–1551.

United States Court of Appeals, First Circuit.

Submitted May 6, 1983.

Decided Sept. 14, 1983.

Robert Kalina, Michael S. Washor, Joseph J. McCarthy, Jr., and Washor, Greenberg & Washor, New York City, on brief, for defendant, appellant.

Daniel Lopez Romo, U.S. Atty. and E.M. De Jesus, Asst. U.S. Atty., Hato Rey, P.R., on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Defendants appeal from a conviction of aiding and abetting each other in unlawfully, knowingly, and intentionally possessing approximately 41,000 pounds of marijuana in violation of 18 U.S.C. §§ 2, 7(1) and 9, and 21 U.S.C. § 955a(a).[1] A judgment of

---

1. 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against

guilty was rendered against defendants in accord with a stipulation of the parties after the district court denied their motions to suppress.

This is another addition to the rather long line of cases in this circuit involving searches and seizures on the high seas. The facts, which are set forth in detail in the district court opinion, 540 F.Supp. 1282, can be summarized as follows.

On March 28, 1982, the Coast Guard ship Pointe Whitehorn was patrolling in the Anegada Passage which separates the Virgin Islands from the Leeward Islands. It was on the lookout for a boat which had been identified by a Coast Guard plane as a black and white "shrimper" (a shrimp fishing boat) with the name of Jeanie B. The captain of the Pointe Whitehorn had been informed that the Jeanie B was suspected of smuggling and that there might be ten armed men on board. The captain knew that the Anegada Passage was not a shrimping area.

At about 11:30 p.m. radar contact was made with a vessel about four miles away which was not visible because its running lights were not lit. The Pointe Whitehorn closed to within one hundred yards of this vessel. Its search light showed the vessel to be a black and white shrimper which the captain of the Pointe Whitehorn first thought carried the name Jeanie B. Inspection by binoculars, however, showed the name to be Irene B II. The vessel was riding low in the water (down to its waterline), showed no flag and the name of its home port, Cape May, New Jersey, was obscured by nets.

Attempts were made to contact the Irene B's crew by radio and a hailer. The Pointe Whitehorn which is eighty-two feet long and is painted white except for diagonal red and blue stripes on either side of the bow came within fifty yards of the Irene B. When the crew of the Irene B failed to respond to either the radio or hailer, a blue flashing light and siren on the Pointe Whitehorn were activated. International Code Flags S and P were run up the signal mast of the Pointe Whitehorn. A spotlight was turned on these signals as well as the Coast Guard ensigns and the light was also played intermittently on the crew of the Pointe Whitehorn standing on her deck in uniform.

The result was that the Irene B tried to get away. A chase that took between five and six hours then ensued. During the chase the Irene B tried twice to ram the Pointe Whitehorn which fired more than ninety rounds from a .50 caliber machine gun across the bow of the Irene B in an attempt to get her to stop. The Irene B was eventually stopped by towing a cable across her bow which entangled her screws. At the time she stopped, the Irene B was listing about ten degrees to port.

A three-man armed boarding party was put on board. The officer in charge, who

---

the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 7(1) provides:

The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:

(1) The high seas, any other waters within the Admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

18 U.S.C. § 9 provides:

The term "vessel of the United States", as used in this title, means a vessel belonging in whole or in part to the United States, or any citizen thereof, or any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof.

21 U.S.C. § 955a(a) provides:

(a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

had prior experience in apprehending marijuana smugglers, smelled marijuana as soon as he reached the deck of the Irene B. The two defendants were held prisoners while the rest of the boarding party proceeded to search the vessel for other crew members and weapons. No other crew members were found, but the search disclosed that the forward and main holds were fully loaded with marijuana. The port list was due to the fact that one of the intake pipes in the engine room had been broken, presumably in an attempt to scuttle the ship. Both defendants were arrested and the Irene B was towed to San Juan, Puerto Rico.

Two issues are raised by appellants: (1) that their fourth amendment rights were violated when the ship was seized pursuant to 14 U.S.C. § 89(a); and (2) that the stop and seizure were unconstitutional because there was no basis to reasonably suspect that the Irene B was engaged in criminal activity.

The first issue is foreclosed by *United States v. Hilton,* 619 F.2d 127, 131 (1st Cir.1980), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980), in which we held that under 14 U.S.C. § 89(a) [2] "the Coast Guard may stop and board any American flag vessel on the high seas without a warrant and without any particularized sus-

picion of wrongdoing." (footnote omitted). We have consistently adhered to this position. *United States v. Dillon,* 701 F.2d 6 (1st Cir.1983); *United States v. Green,* 671 F.2d 46, 53 (1st Cir.1982), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *United States v. Hayes,* 653 F.2d 8, 11–12 (1st Cir.1981); *United States v. Arra,* 630 F.2d 836, 840–46 (1st Cir.1980). This holding is based in part on our finding that automobile stops are significantly different from those of boarding vessels on the high seas and that the holding of *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), that random warrantless stops of automobiles to check licenses and registrations are unconstitutional, does not extend beyond dry land. *United States v. Hilton,* 619 F.2d at 132–133. The recent Supreme Court decision in *United States v. Reynaldo Villamonte-Marquez,* —— U.S. ——, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), confirms our position that for fourth amendment purposes seagoing vessels and automobiles must be treated differently and effectively sinks appellants' contention to the contrary. In *Villamonte-Marquez* the Court upheld a documentation boarding under 19 U.S.C. § 1581(a) [3] which gives custom officials the same sort of boarding au-

---

**2.** 14 U.S.C. § 89(a) provides:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States

has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

**3.** 19 U.S.C. § 1581(a) provides:

(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

thority within waters of the United States as 14 U.S.C. § 89(a) gives the Coast Guard on the high seas. We quote extensively from the Supreme Court opinion because of appellants' contention that our reasoning in *Hilton* was erroneous and that *Delaware v. Prouse* controls.

Our focus in this area of Fourth Amendment law has been on the question of the "reasonableness" of the type of governmental intrusion involved. "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse,* 440 U.S., at 654 [99 S.Ct. at 1396]. See also *Camara v. Municipal Court,* 387 U.S. 523 [87 S.Ct. 1727, 18 L.Ed.2d 930] (1967); *Terry v. Ohio,* 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968); *Cady v. Dombrowski,* 413 U.S. 433 [93 S.Ct. 2523, 37 L.Ed.2d 706] (1973); *United States v. Brignoni-Ponce,* 422 U.S. 873 [95 S.Ct. 2574, 45 L.Ed.2d 607] (1975); *United States v. Martinez-Fuerte,* 428 U.S. 543 [96 S.Ct. 3074, 49 L.Ed.2d 1116] (1976). It seems clear that if the Customs officers in this case had stopped an automobile on a public highway near the border, rather than a vessel in a ship channel, the stop would have run afoul of the Fourth Amendment because of the absence of articulable suspicion. See *United States v. Brignoni-Ponce, supra.* But under the overarching principle of "reasonableness" embodied in the Fourth Amendment, we think that the important factual differences between vessels located in waters offering ready access to the open sea and automobiles on principal thoroughfares in the border area are sufficient to require a different result here.

The difference in outcome between the roving patrol stop in *Brignoni-Ponce, supra,* and the fixed checkpoint stop in *Martinez-Fuerte, supra,* was due in part to what the Court deemed the less intrusive and less awesome nature of fixed checkpoint stops when compared to roving patrol stops. And the preference for roadblocks as opposed to random spot checks expressed in *Delaware v. Prouse, supra,* reflects a like concern. But no reasonable claim can be made that permanent checkpoints would be practical on waters such as these where vessels can move in any direction at any time and need not follow established "avenues" as automobiles must do. Customs officials do not have as a practical alternative the option of spotting all vessels which might have come from the open sea and herding them into one or more canals or straits in order to make fixed checkpoint stops. Smuggling and illegal importation of aliens by land may, and undoubtedly usually does, take place away from fixed checkpoints or ports of entry, but much of it is at least along a finite number of identifiable roads. But while eventually maritime commerce on the inland waters of the United States may funnel into rivers, canals, and the like, which are more analogous to roads and make a "roadblock" approach more feasible, such is not the case in waters providing ready access to the seaward border, beyond which is only the open sea.

—— U.S. at ——, 103 S.Ct. at 2579–80. This reasoning may not satisfy some of the scholars,[4] but it should repel any further appeals on the grounds that we have not charted the correct course.

■ The second issue is disposed of on the facts. In *United States v. Green,* 671 F.2d at 53, we adopted the approach of the Fifth Circuit and held that "in addition to permitting proper administrative searches, the fourth amendment allows government officers, who are otherwise authorized, to board and search a vessel on the high seas should they have reasonable and articulable

---

4. *See* Note, *High on the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless* *Searches at Sea,* 93 Harv.L.Rev. 725 (1980).

grounds for suspecting that it is engaged in criminal activity." (footnote omitted).

Defendants contend that the facts here do not admit of a finding that there were reasonable and articulable grounds for suspecting that the Irene B was engaged in criminal activity.[5] We conclude otherwise. The pre-chase facts are undisputed: the presence of a shrimper in an area not fished for shrimp; the failure to have running lights on at 11:30 p.m.; no flag showing; the name of the vessel's home port covered by nets; the fact that the vessel was riding low in the water; and the refusal of the crew to respond to radio messages, loud speaker hailing and spotlight illumination. Although the captain of the Pointe White-horn may have originally mistaken the Irene B for the Jeanie B, he had ample grounds for suspecting that the Irene B was smuggling drugs. It was not the mistaken identification of the Irene B that led to the boarding and search, but her own derelictions and actions.

We hold that prior to the chase the Coast Guard had sufficient reasonable and articulable grounds for suspecting that the Irene B was engaged in criminal activity to justify a boarding and search. When the Irene B took evasive action the suspicion ripened into probable cause.

*Affirmed.*

---

**5.** Our discussion of this issue does not mean that we have found that the district court's ruling that the boarding was a safety and document inspection pursuant to 14 U.S.C. § 89(a) was clearly erroneous. Because the testimony as to the reason for the boarding was somewhat ambiguous, *see* Tr. at 77, we think it prudent to rule on both issues raised by appellants.