UNITED STATES of America, Appellee,

v.

William A. WRAY,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Gordon R. MacGILLVRAY,
Defendant, Appellant.

Nos. 84–1293, 84–1294.

United States Court of Appeals,
First Circuit.

Argued Sept. 13, 1984.

Decided Nov. 8, 1984.

---

Nancy Gertner, Boston, Mass., with whom David L. Kelston, Silverglate, Gertner, Baker & Fine, Andrew Good, and John J. Barter, Boston, Mass., were on brief, for defendants, appellants.

Oliver C. Mitchell, Jr., Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, Circuit Judge, ALDRICH and SKELTON,* Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Defendants were convicted of various narcotic offenses as a result of a Coast Guard boarding of their yacht on the high seas on June 22, 1983, and the discovery of two and a half tons of marijuana in plain sight, below deck. On this appeal the only questions concern the legality of the boarding. We affirm.

*Overture*

■ Defendants, Wray and MacGillvray, were the sole crew of the 45' fibreglass yawl OCEAN OVERTURE when she was approached by a Coast Guard cutter the morning of June 18, 1983, some 210 miles off the coast. Defendants' answers to questions disclosed that they were United States citizens; that the vessel was of United Kingdom registry; that their last port of call was Antigua, N.A., and that their destination was Newport, Rhode Island. Although nothing suspicious was observed at this time, the Coast Guard sought a radio check[1] on the vessel and the crew, which was returned positive as to Wray.[2]

---

* Of the Federal Circuit, sitting by designation.

1. EPIC—an El Paso computer listing narcotic suspects.

2. This check was later found of no value. A check with Antigua showed no record of the yacht's having cleared from there. This later was found erroneous. We rely on neither.

Permission to board was refused. Coast Guard headquarters decided to maintain surveillance until the vessel entered the United States waters. Defendants grumble that this meant they were "already restrained." This is erroneous for two reasons. In the first place, it would be entirely lawful to inspect a foreign flag vessel, even in the total absence of suspicion, when it entered territorial waters. 19 U.S.C. § 1581(a); *United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *United States v. Williams,* 617 F.2d 1063, 1072–73 (5th Cir. 1980) (en banc). Hence an intention to do this could not be a restraint. Nor could defendants be restrained by a decision of which they were unaware. *See United States v. Mendenhall,* 446 U.S. 544, 554, and n. 6, 100 S.Ct. 1870, 1877, and n. 6, 64 L.Ed.2d 497 (1980).

### First Movement

■ The first cutter left, but on June 20 she was replaced by another, the POINT JACKSON. At this time the OCEAN OVERTURE was about 50 miles from shore. The POINT JACKSON immediately observed her, by reference to her boot top, to be down on her lines,[3] and reported to headquarters that she was riding low in the water. Instructions were given to keep surveillarce and to make arrangements to board when within the 12 mile limit. The following day the sea was calm, with light

airs. One of the defendants explained their failure to proceed under power as due to engine problems. The court did not resolve whether he also said they were out of fuel. Surveillance was sometimes close, with mounted guns, which defendants complained of as frightening.[4] Defendants were informed of the decision that if they did not consent to an earlier boarding, they would be boarded as soon as they reached United States waters.

### Second Movement

About noon on June 22, when within 18 miles of the coast, the yacht was observed to change her course to southwest. On inquiry, defendants said they had decided to go back to Antigua, or the West Indies, and not enter the United States. The POINT JACKSON thereupon sought, and received, headquarter's permission to board, and launched a boarding party. This was the first occasion when defendants can successfully argue they were in any way restrained. Shortly before reaching the vessel, a strong odor of marijuana was detected.[5] Upon boarding, bales thereof were found throughout the vessel, with a somewhat greater number on the port side.

### Theme

■ The basic issue, which can resolve all questions, is the existence of probable cause to board.[6] Defendants attack each

---

3. Many small vessels, particularly sailing yachts, have a decorative stripe, or boot top, at the waterline, painted a different color from the side and the bottom. This should show at all times, unless the vessel is heeling towards the viewer.

4. There is no claim that the guns were aimed at the yacht. We would take notice that the Coast Guard is often conspicuously armed, in the interests of safety. It is not to be objected to.

5. This fact, of course, removed any doubts as to the existence of contraband prior to the actual boarding. Defendants assert that it could not be considered because they had already been improperly detained. A response might be made, analogous to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that an initial stop might be justified by mere reasonable suspicion, which clearly did exist. *Cf. United*

*States v. Hensel,* 699 F.2d 18, 27–30 (1st Cir. 1983), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317. Since, however, we find that probable cause, as distinguished from mere reasonable suspicion, already appeared. we need not pursue this.

6. Defendants brief extensively argues questions of international law, conventions, and a U.S.–U.K. high seas boarding agreement. Concededly, the existence of probable cause to board would moot these questions. 14 U.S.C. § 89(a); Agreement on the Suppression of the Unlawful Importation of Narcotic Drugs into the United States, Nov. 13, 1981, United States-United Kingdom, —— U.S.T. ——, T.I.A.S. No. 10296. We reject defendants' request that we rule on these further questions.

item of proof individually. We start by noting that, unlike the more customary high seas case, there was no question at the outset of defendants' intent to enter United States waters, where, as already pointed out, they could be freely boarded. That intent had been specifically announced. The sole question, accordingly, is cause to believe narcotics were on board. On the undisputed facts and the court's well supported findings we consider defendants' denial to be frivolous.

The first item of proof was the POINT JACKSON's commander, Lt. How's observation that the yacht was low in the water, and sluggish. Lt. How testified,

> For such a good-looking sailboat it didn't seem to ride with a good set of lines. It was particularly sluggish, and I realized that what I thought initially was the waterline, where the water was, was, in fact, a decorative line above the waterline. I thought they had something very heavy on board.

How had extensive experience with sail yachts. He was corroborated by Petty Officer Phippen, who also remarked there was a slight list to port—an observation confirmed by the ultimate discovery of the bales' location. More to the point, defendants' expert conceded at trial that with the extra weight on board the yacht would necessarily be down on her lines, and that if the bales were stored disproportionately forward—which the court found they were—she would be sluggish. Nevertheless, as if this were a trial de novo, defendants attack Lt. How's testimony and the court's finding in accordance therewith, on the ground that a similar report had not been made by the first cutter, disregarding the fact that the record shows she had been 500 yards away. They further object because How made his first observations "at night!" disregarding his testimony that he

came within 30 yards and used a searchlight. In addition, defendants engage in much backing and filling[7] about the boot top's location. The positive testimony that the bales were stored disproportionately forward, and the court's acceptance thereof[8] they would overcome by reference to measurement testimony to the effect that, physically, it would have been possible to store the bales evenly throughout. Even this reference overlooks testimony that such a distribution would have made the cabin almost unlivable.

■ That experienced counsel should attempt such reargument of fully supported findings we find altogether inexcusable.

Apart from the old college try to meet the underlying irrefutable facts and the court's findings, defendants in no way suggest what was wrong with Lt. How's conclusion therefrom, that "they had something very heavy on board." Nor do they suggest what this could have been, except contraband. Short of a direct display, it would seem difficult to think of a greater indication of contraband's presence. Defendants do not refute the appearance of probable cause for charging Lt. How with acting on a "hunch." Again, this is extraordinary. That we described a somewhat like situation as reasonably suspicious in *United States v. Green*, 671 F.2d 46, 51 (1st Cir.1982), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352, does not help defendants. All that was involved in that case was reasonable suspicion. The court below, also, at this point had no occasion to go further. If we should be thought mistaken as to the balance of the case, we have no hesitation in saying that Lt. How already had probable cause to board.

This, however, was not all. With 18 miles left of a 2,000 mile journey, engine trouble, and perhaps short of water and

---

7. In spite of its perhaps farmlike connotation, this phrase describes a sail-shifting maneuver on a squarerigger that results in no net forward progress.

8. "[T]he bulk of the marijuana was stowed forward ... [and] I have no doubt that 5,050 pounds of marijuana stowed preponderantly in the forward section of the boat would have produced noticeable changes in trim and sluggish behavior readily observable by an experienced sailor."

supplies, and faced with boarding if they entered United States waters, defendants announced that they were turning back, and were not going to enter. They concede that, if properly considered, this action would, under the circumstances, support an inference of an illegal cargo, but they say it could not be looked to because they had an absolute right not to enter and to be free of search. This contention may well be correct, assuming a final and binding election not to enter. *Compare United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 2579–80, 77 L.Ed.2d 22 (1983) *with United States v. Martinez-Fuerte,* 428 U.S. 543, 558–59, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976). It would be ingenuous to a degree, however, to make that assumption. Obviously, the "decision" could be revoked as soon as the Coast Guard departed. It would be only natural for the Coast Guard to regard the announcement as a ploy to persuade it to depart. The district court found this action removed any doubt as to probable cause. It was clearly correct.

Defendant would further say that, even if evasive, the turning-back action could not be looked to because it had resulted from the government's own conduct. *See Wong Sun v. United States,* 371 U.S. 471, 482–83 and n. 10, 83 S.Ct. 407, 414–15 and n. 10, 9 L.Ed.2d 441 (1963). The *Wong Sun* principle, however, subsumes that the government's conduct had been improper. It could not be improper to watch the vessel to make sure that she did not evade the search to which her stated course, if continued, would lawfully subject her. The Coast Guard's surveillance may have made defendants unhappy, but defendants cannot, by a stroke of the pen, translate "annoying persistence" into "intrusive and improper Coast Guard behavior." Indeed, we regard the Coast Guard's advance notice eminently fair, rather than the reverse.

There is equally no merit in defendants' contention that the Coast Guard could not rely on their turning-back action because the decision to board had been made in advance. There is a basic fallacy in this argument. In addition to the fact that defendants were not aware of the decision, *United States v. Mendenhall,* ante, a defendant is not hurt by a decision, but by conduct. The justifications for conduct are the circumstances at the time it takes place; not at some prior date. But, beyond this, there was nothing wrong with the decision when it was made. The decision was, (a) to board if the yacht crossed into United States waters, or (b) if she sought to turn back. Both were justified. Surely the Coast Guard could plan ahead.

In conclusion, this is a case where defendants should not have been admitted to bail pending appeal. We instruct the district court to revoke bail without awaiting mandate. First Circuit Local Rule 16.

*Affirmed.*