**UNITED STATES of America, Plaintiff,**

v.

**Joaquin Cardona SANDOVAL, et al., Defendant.**

**Crim. No. 90–084 (RLA–JP).**

United States District Court, D. Puerto Rico.

July 16, 1991.

763

Jeannette Mercado Ríos, Asst. U.S. Atty., Hato Rey, P.R., for plaintiff.

David Román, Old San Juan, P.R., for defendant Cardona Sandoval.

Charles Rodriguez, Isla Verde, P.R., for defendant Rojano Rangel.

Juan R. Acevedo, Hato Rey, P.R., for defendant Gómez Olarte.

Rachel Brill, Asst. Federal Public Defender, Old San Juan, P.R., for defendant Molina.

OPINION AND ORDER

PIERAS, District Judge.

The Court has before it the defendants' objections to the Magistrate's Report and Recommendation which recommends that the defendants' motion to suppress be denied. After reviewing the record in this case and considering the arguments of the parties, we adopt the Magistrate's Report and Recommendation, with certain modifications, and deny the defendants' motion to suppress.

## I. BRIEF SUMMARY OF EVENTS AND PROCEDURAL HISTORY

This case involves four defendants, Joaquin Cardona Sandoval, Alexander Rojano Rangel, Jorge Gómez Olarte and Alfonso Molina, who were sailing from the coast of Colombia on a boat with a Florida Registration Number "FL8304EM." On February 25, 1990, the U.S.S. Biddle, a Navy guided missile cruiser, was patrolling the seas and was ordered to board any vessels heading north. The Biddle spotted the defendants' boat and conducted an on-board search. After the search was finished and the inspection team was back on board the Biddle, it was decided that the boarding inspection had been incomplete and that another search of the boat was necessary.

On February 26, 1990, the second search was conducted, at which time it was decided that the boat should be taken to shore in Puerto Rico for a further dock-side search. The defendants were transferred to the Biddle, and the defendants' boat and the Biddle sailed to Puerto Rico. On February 28, 1990, the engine of the defendants' boat failed, and eventually the Biddle towed the boat into shore. The Coast Guard officers and defendants arrived at Roosevelt Roads base in Ceiba, Puerto Rico, on February 28, 1990. Coast Guard Lieutenant George Boyle, the officer in charge of the boarding team, and several other Coast Guard officers continued to search the boat and began the process of dismantling the vessel. During this time period, the defendants stayed in a shop-type area on the premises of the Roosevelt Roads base with Israel Chacón, a Coast Guard Petty Officer. In

the evening of the same day, the defendants were taken to the United States Immigration and Naturalization Services office, located in Luis Muñoz Marín Airport, in San Juan. They were later transported to the Salvation Army, in Old San Juan, where they spent the night.

On March 1, 1990, Lieutenant Boyle turned the boat over to Coast Guard Lieutenant Richard Gatlin, who was part of a law enforcement detachment team in San Juan. The detachment team then brought the boat to Puerta del Rey in Ceiba, and Gatlin, along with one of his team members and two Customs officials, began to further search the boat in the late afternoon. According to Gatlin, he received orders from a Seventh District Law Enforcement officer to perform a destructive search of the boat. The search continued for three hours, and the defendants remained at the Salvation Army throughout the day and the night.

On the following day, March 2, 1990, the team resumed the destructive search of the boat. Early in the afternoon, at about 1:00 p.m., they discovered packages of cocaine in the engine room of the boat, after drilling through two beams running from the back portion of the vessel to the engine room in the front of the vessel. After the discovery of approximately 162 packages of cocaine, officials from the Drug Enforcement Agency ("DEA") and Customs arrested the defendants and transported them to the Puerto Rico State Penitentiary. The government filed a criminal complaint against the defendants the following Monday, March 5, 1990. The preliminary and detention hearing was held before a United States Magistrate Judge on March 7, 1990, who found probable cause against all the defendants.

The defendants filed a motion to suppress the evidence based on several grounds. We briefly summarize their arguments. First they argue that they were arrested on February 26, 1990, without probable cause and were unconstitutionally restrained for the following four days so that all evidence seized by the government was a result of their illegal arrest and must

be suppressed. Also, the defendants claim that the Coast Guard searches and the seizure and eventual destruction of the boat were illegal and were performed without probable cause and without a warrant, in violation of the Fourth Amendment of the United States Constitution. Finally, the defendants argue that the failure to consult a magistrate during each phase of the defendants' arrest violates Rule 5(a) of the Federal Rules of Criminal Procedure, so that all evidence obtained as a result of their arrest should be suppressed.

After several hearings involving the testimony of one of the defendants and some of the Coast Guard officers and other government officials who participated in various stages of the events occurring prior to the defendants' arrest, the Magistrate issued a Report and Recommendation which concluded that the defendants' motion to suppress should be denied. As stated above, we essentially affirm this Report and Recommendation, with some amendments. The defendants oppose the Report and Recommendation as to certain factual as well as legal conclusions of the Magistrate. We first address defendants' factual objections, and then the legal objections.

## II. FACTUAL OBJECTIONS TO REPORT AND RECOMMENDATION

Defendants argue that the Magistrate erred in noting that the vessel FL8304EM, the boat defendants were sailing in, was the same boat known as the "Wicho." We disagree with the defendants, noting that Agent De Vorre stated that after checking the DEA computer, he found out that there was a computer record of the vessel with registration number FL8304EM and that the vessel also had an alias name of "Wicho." Vol. I, Tr. 13, 28, 31; Exhibit A, De Vorre Report of Investigation at paragraph 3 (states that a check of the vessel number showed that it was formerly known as the "Wicho").

Also, defendants argue that the Magistrate erred in "implying that there was anything suspicious about the boat" that would have caused the crew of the Biddle

to detain and search the boat, since no conclusive information connected the boat's number FL8304EM with the name "Wicho." The fact that the boat's radio was not turned on is, according to defendants, insignificant. We agree with the government that the Magistrate was not implying anything suspicious about the vessel in his description on page 3 of the Report and Recommendation.[1] These factual findings merely point out that the "Wicho" was observed to have no flag, although it had an American registration number, and it did not respond to radio or loud hailer communication attempts made by the Biddle. Similarly, the Magistrate's statement that the boat's name "Wicho" did not appear in the boat's registration document is a factual statement rather than an implication, since the registration documents did not contain the name "Wicho." The Magistrate's statement that Cardona was unclear as to the purpose of the trip is followed by the statement that "whether it was for repairs for the boat or of the engine." Thus, the uncertainty relates to the repair of the boat or the engine, which accurately reflects defendant Cardona's testimony. *See* Vol. VIII, Tr. 4 ("Q Why were you going to St. Martin. A We were going to take the boat to St. Martin. Q Why? A I believe it was either the repairs for the engine or repairs for the boat.").

Defendants also claim that the Magistrate was incorrect in concluding that the DEA/El Paso Intelligence Center ("EPIC") lookout list obtained by the Coast Guard reported that the boat had hidden compartments, and that the existence of hidden compartments in the boat was not discovered until after the dockside search of the boat. As the Magistrate pointed out in his Report and Recommendation, Lieutenant Boyle's written statement of the events occurring on February 25, 1990, Defendant's Exhibit F, does not specifically state in the first paragraph that the boat itself was listed as appearing on the EPIC list with hidden compartments, but the second paragraph states that "Current DEA look-out list indicates vessel has hidden compartments for smuggling." The Magistrate concluded, according to Boyle's testimony, that even though Boyle could not remember at what time he was informed that the boat was listed for suspected hidden compartments, he received this information sometime on February 25, 1990. Report and Recommendation at 5; Vol. II, Tr. 52–53. Clearly, the Magistrate, who presided over the proceedings in this case, was giving credibility to the testimony of Boyle, and because he was in a position to judge such credibility, we accept his determination.

We agree with the defendants that failure to access the water tank was not a stated reason for boarding the boat a second time. From a perusal of the record, no evidence shows any specific reference of failure to access the water tank area as a reason for the second boarding. Petty Officer Spake, who was a member of the boarding team, testified that he thought the deck of the boat was "rotting through," Vol. V, Tr. 56, and that there were two inspection plates on the floor, which he lifted up and which uncovered a water tank beneath them. *Id.* at 58. *See also* Vol. III, Tr. 13 (reboarding due to Boyle's conclusion that all of spaces on boat not 100% accounted for, without specific reference to water tank); defendant's Exhibit E, Boarding Report dated February 26, 1990 at 4 (summarizing first boarding and stating that recently installed medicine cabinet on the bulkhead in the head of the boat was reason for reboarding vessel). Spake claimed that had he not checked the plates, no one would have known that there was a water tank underneath them. Vol. V, Tr. 59.

Also, Lieutenant Boyle testified that he wanted the water tank to be examined because it was twelve to fourteen feet long and that it was large, but it had holes in it and was not being used, because there were water containers on deck. Boyle stated that there had been recent construction

---

Although we agree that the Magistrate's factual findings do not imply anything suspicious about the boat, we address the Magistrate's legal analysis of these facts considering the testimony of certain witnesses in section III, *infra*.

on the boat, and the water tank should have been fixed or removed, because it was taking up too much space in the cabin area. Vol. I, Tr. 77–78. However, as noted above, the Boarding Report compiled as a result of the February 25, 1990, boarding and the debriefing which occurred afterward, stated that a recently installed medicine cabinet on bulkhead in head of boat was reason for reboarding vessel. Therefore, we agree with the defendants that the Magistrate erroneously concluded that the water tank was a *specific* reason for the second boarding, and reject this factual statement of the Report and Recommendation.

When the crew of the Biddle searched all night on February 26, 1990, the Magistrate concluded that the Biddle spotted the boat, heading in a "direction apparently different from its declared direction to St. Martin." Report and Recommendation at 7. The defendants object to this statement because they claim that the boat was traveling in a northeast direction, and that boats often have to tack in one direction or another to maintain their course, which Lieutenant Boyle allegedly admitted. Lieutenant Boyle agreed that the position of the defendants' boat when discovered on February 26, 1990, was slightly north and east of its position the previous day. Vol. IV, Tr. 9. He further testified that given the two different positions which the Biddle found the defendants' boat in on February 25, and February 26, he could not tell what course they had been travelling, Vol. IV, Tr. 10, but that depending on the condition of the sea, the boat could have been heading north and then south, until eventually ending up at the point the boat was found on February 26. According to Boyle, *when the boat was found* for the second time, it was on a course that was southeast. Vol. IV, Tr. 10, lines 4–5; Vol. I, Tr. 65. The Magistrate considered the southeast direction the boat was heading in on February 26, 1990: the Report and Recommendation states that the boat was going in a direction *apparently different* from its declared direction. Thus, this objection is without merit.

Defendants claim that the magistrate erroneously asserts that the captain and crew consented to be taken to Puerto Rico, because the Report and Recommendation says that "there was no direct challenge by the boat's crew of the decision to take the boat to Puerto Rico." Report and Recommendation at 8. We do not deem this statement to mean that they consented to the boarding. In the same paragraph the Magistrate explained that the master of the vessel, defendant Cardona, would not steer the boat to Puerto Rico and would not be separated from his crew. Thus, we agree that the defendants did not consent to be taken to Puerto Rico.

Defendants object to the Magistrate's determination that only one guard was assigned to watch over the defendant at Roosevelt Roads. Coast Guard Petty Officer Israel Chacón testified that while he was with the defendants in Roosevelt Roads, another person stayed with him for a short time. Vol. VI, Tr. 7, 9. Insofar as page 10 of the Report and Recommendation recognizes this fact by stating that "[i]f Chacón had to momentarily leave the shop, another Coast Guard official would stay with the crew ... [,]" this objection is unwarranted.

The defendants' remaining objections related to the further searching at Roosevelt Roads, the detention by Immigration officials are also denied. The defendants' allegations concerning the government's violation of Federal Criminal Rule of Procedure 5(a) is addressed *infra*.

### III.  LEGAL OBJECTIONS

**A.  Magistrate's determination that defendants were not arrested prior to March 2, 1990**

■  The defendants argue that the Magistrate erred in determining that they were never arrested during the course of the search and destruction of their vessel. We accept the Magistrate's determination that all the actions of the Coast Guard officers were taken pursuant to Coast Guard procedures and agree that the defendants were not effectively under arrest by the Coast Guard officials.

We further adopt the portion of the Magistrate's Report and Recommendation which concludes that the defendants were not arrested by Immigration officials.

### B. Issue of Standing

■ Because we have decided that the defendants were not arrested during the time period covering February 26, 1990, through March 2, 1990, we also accept the Magistrate's conclusion that the defendants lack standing to challenge the seizure of the evidence from the vessel due to the fact that they had no reasonable expectation of privacy in the secret compartments inside the engine room of the boat where the cocaine packages were found. *United States v. López*, 761 F.2d 632, 635–36 (11th Cir.1985); *United States v. Arra*, 630 F.2d 836, 841 n. 6 (1st Cir.1980). As the Magistrate recognized, the defendants only claim of standing to object to the seizure of the boat and the evidence obtained rests upon their alleged illegal arrest or detention. *See Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (fingerprints obtained as fruit of illegal detention inadmissible); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (confession secured by "exploitation" of illegal arrest inadmissible).

### C. Determination to seize and destroy boat required probable cause

■ The defendants claim that the Coast Guard's decision to take the boat to shore required probable cause, which did not exist at the time the boarding party searched the defendants' vessel for the second time. After carefully considering the evidence before the court and the relevant case law, we agree with the defendants that the boarding officers needed probable cause in order to bring the vessel to Puerto Rico, and we further conclude that these officers had such probable cause. Thus, the second boarding and subsequent actions of the Coast Guard officials were lawful.

When the Coast Guard officers of the Biddle boarded the defendants' vessel, they were acting under the authority of 14 U.S.C.A. § 89(a), which provides, in pertinent part, that:

> [t]he Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes ... [the Coast Guard] may at any time go on board of any vessel subject to the jurisdiction ... of the United States, address inquiries to those on board, examine, the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search ... it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

Also, under 10 U.S.C.A. § 379(a) (Supp. 1991), the Secretary of Defense may assign Coast Guard officials to duty aboard Navy ships for law enforcement drug interdiction functions to cover "area[s] outside the land area of the United States ... in which [it is] determine[d] that activities involving smuggling of drugs ... are ongoing."[2] Therefore, both of these statutes empower the Coast Guard to conduct boarding searches and seizures on the high seas,[3] in areas outside the customs waters.

---

2. In this case, we assume that 10 U.S.C.A. § 379(a) (Supp.1991) applies as Lieutenant Boyle testified that he was the "direct liaison between the Coast Guard and the Navy ... [and that he was] the Coast Guard's representative on board the Navy ship [Biddle]." Vol. I, Tr. 57.

3. We use the term "high seas" to refer to the area outside the area known as customs waters, as defined in 19 U.S.C.A. § 1401(j). The customs waters area is a twelve mile limit which includes the territorial sea, extending to three miles from the coast, and the contiguous zone,

The First Circuit has spoken on the issue of searches conducted pursuant to the Coast Guard's authority under 14 U.S.C.A. § 89(a) and the constitutionality of such searches in the context of the fourth amendment's proscription against warrantless searches. On numerous occasions it has emphasized that the Coast Guards may constitutionally "stop and board an American flag vessel on the high seas without a warrant and without any particularized suspicion of wrongdoing" to conduct an administrative safety and document inspection. *See, e.g., United States v. Elkins,* 774 F.2d 530 (1st Cir.1985); *United States v. Burke,* 716 F.2d 935, 937 (1st Cir.1983). *Accord United States v. Williams,* 617 F.2d 1063, 1077–78 (5th Cir. 1980) (en banc). It has also held that the Fourth Amendment permits the Coast Guards to conduct a high seas board and search when they have "reasonable suspicion," *United States v. Hensel,* 699 F.2d 18, 25 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983), or "reasonable and articulable grounds for suspecting that . . . [the boat] is engaged in criminal activity." *United States v. Green,* 671 F.2d 46, 53 (1st Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). *See also Burke,* 716 F.2d at 938–39.

In *United States v. López,* 761 F.2d 632 (1985), the Eleventh Circuit considered the issue of the degree of suspicion necessary to authorize intensive searches and seizures involving the decision to transport an American boat on the high seas to dock in a United States port for further searching. The Court explained that a full "stem to stern" search followed by a decision to take a vessel to shore may be proper pursuant to 14 U.S.C. § 89(a), if probable cause is present. *Id.* at 636–37. According to *López,* the general standard to be used in determining whether such probable cause existed is whether there were facts and circumstances "known to law enforcement officials which could have warranted their reasonable belief that a crime had been or was being committed . . . [citation omitted], or whether viewing such facts in their totality, together with the synthesis of what the agents collectively heard, knew and observed, all considered in light of the agent's individual experience, there was the probability that criminal activity was afoot [citation omitted]." *Id.* at 636. *See also United States v. Wray,* 748 F.2d 31, 34 (1st Cir.1984) (probable cause to board foreign vessel in high seas based upon, *inter alia,* officer's extensive experience with sail yachts). These facts and circumstances need not be present at the precise time of boarding, and the decision to take a vessel to shore will probably be made after the boarding occurs and the officials become aware of more facts as "the Coast Guard ha[s] authority to act upon suspicions aroused during and prior to the boarding." *United States v. Alvarez-Mena,* 765 F.2d 1259, 1269 (5th Cir.1985).

Based upon the evidence in the record, we conclude that when viewing the facts of this case in their totality, and the synthesis of what the Coast Guard officials conducting the boarding heard, knew and observed, when considered in light of their individual experience, that there was the probability that criminal activity was afoot when the decision to take the boat to shore was made.[4] Petty Officer Spake, who at the time had been with the Coast Guard for nine years, testified that upon his initial boarding of the boat, he noticed that the

---

extending from three to twelve miles from the coast. *United States v. Williams,* 617 F.2d 1063, 1073 n. 6 (5th Cir.1980). Prior to the enactment of 10 U.S.C.A. § 379(a) in 1986, the Coast Guard's only statutory source of authority to seize and search vessels beyond the twelve-mile limit of customs waters was 14 U.S.C. § 89(a). *Id.* at 1073.

**4.** We note that some of these facts are the various factors discussed by the Magistrate in Part 4 of the Report and Recommendation, which discusses the Coast Guard's authority to board and search a vessel if there is reasonable suspicion that the vessel is engaged in criminal activity. *See* page 768, *supra.* We accept the Magistrate's enumeration of the many reasons listed for suspecting that the Wicho was engaged in narcotics smuggling, but conclude that in combination, these reasons formed the requisite probable cause to permit the Coast Guards to conduct an extensive search and to bring the boat into shore for further investigation.

construction of the boat was odd, in that the boat itself was in very poor condition but in the cabin was a newly installed shower. Vol. V, Tr. 42. He also stated that the deck of the boat was "rotting." Vol. V, Tr. 56. *See López*, 761 F.2d at 637 (discussing structural characteristics and modifications of boat as factors in decision) *United States v. Andreu*, 715 F.2d 1497, 1500 (11th Cir.1983) (structure of boat indicated potential reconstruction to create space to transport drugs). He pointed out that the registration for the boat was in the name of Luis Rodriguez, but that the master of the vessel had said that the owner's name was Roberto de Armas and did not have the address or telephone number of de Armas. Vol. V, Tr. 44. Thus, when the second boarding of the Wicho occurred on February 26, 1990, Coast Guard Lieutenant Boyle, the officer in charge of the boarding team and the agent in charge of Navy ship, had knowledge of all of this information since he had spoken with Spake in a debriefing session which occurred after the first boarding.[5]

Moreover, Lieutenant Boyle, who has been in the Coast Guard for eight years, testified that he had also received information that the vessel was involved in drug smuggling activities and was on the EPIC lookout list for suspected drug smuggling activity and that one of the crewmembers had come up "EPIC positive."[6] Vol. IV, Tr. 18; Defendant's Exhibit F, Statement by Lieutenant Boyle. He also knew from the first boarding of the Wicho that it did not respond to radio or a loud hailer, Vol. I, Tr. 59, it was flying no flag when it was initially spotted, Vol. I, Tr. 63, there was no home port or name painted on it, the vessel's last port-of-call was Río Jacha, Colombia, a well-known source of drugs, compartments on the ship were old and in poor shape, but that the boat had been recently painted and that large sections of the paint

were peeling off. Vol. I, Tr. 76–77. Also, as discussed earlier, according to Boyle, when the Wicho was found the second time, it was on a course that was southeast, a different direction from the northeast course the boat had been heading in. Vol. IV, Tr. 10, (lines 4–5). In addition, the defendants' boat was travelling in a high risk area of the Caribbean in which drug trafficking is widespread; because of the Coast Guards' experience in this area of Caribbean drug importation, they know that vessels travelling through these waters are often involved in drug-related activities, and that drugs frequently may be hidden in the boats, through ingenious methods, so that the drugs may even be affixed to the vessel to become part of it. *See United States v. Meadows*, 839 F.2d 1489, 1490–91 n. 1 (11th Cir.1988) (vessel's presence in suspect area factored into probable cause determination justifying Coast Guards' boarding of vessel to investigate criminal activity). Therefore, at the time that Lieutenant Boyle consulted his superiors at COMCARIBRON and informed them that after the second boarding, sea conditions were worsening and more spaces needed to be accounted but could not be safely accessed, he had knowledge of all of the aforementioned facts, informed his superiors of these facts, and the decision was made to take vessel to the nearest United States port based on these facts. Vol. I, Tr. 73; Defendant's Exhibit M, Document from COMCARIBRON delineating reasons for "pier-side haul out"; Defendant's Exhibit F, Statement of Lieutenant Boyle.

Based on the preceding discussion, we conclude that given the knowledge of accumulated facts gathered by Lieutenant Boyle and Petty Officer Spake by the time the decision to take the defendants' boat to Puerto Rico was made, there was sufficient evidence to warrant a reasonable belief that a crime had been or was being committed on the defendants' vessel. Thus, the

---

5. As a result of the debriefing session, Lieutenant Boyle was ordered by the Commander of the Caribbean Forces ("COMCARIBRON"), Lieutenant Commander Byrd, to have the boarding team members conduct another inspection for reasons of space accountability.

6. According to Lieutenant Boyle, he had received information from the El Paso Intelligence Center ("EPIC") on February 25, 1990, that one of the crew members had a previous conviction for smuggling marijuana in 1984.

decision to take the boat back to Puerto Rico was lawful.

### D. Failure to address alleged violation of Rule 5 of Federal Rules of Criminal Procedure

 Finally, the defendants maintain that the Magistrate failed to address the government's alleged violation of Rule 5(a) of the Federal Rules of Criminal Procedure. The defendants claim that they were arrested when they first boarded the Biddle on February 26, 1990, and when they were taken to the Salvation Army on March 1, 1990, and then to the State Penitentiary on March 2, 1990, without being brought before the nearest available federal magistrate soon after they were arrested, so that all evidence seized after the defendants were seized and arrested should be suppressed.

Federal Rule of Criminal Procedure 5(a) requires that

> [a]n officer making an arrest ... shall take the arrested person without unnecessary delay before the nearest available federal magistrate or, in the event that a federal magistrate is not reasonably available, before a state or local judicial officer ... If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forthwith
> .....

The purpose of this Rule is to ensure that a judicial officer advises the defendant of his or her constitutional rights and thereby prevent unlawful police tactics which may occur before bringing the accused in front of an officer of the court. *Culombe v. Connecticut*, 367 U.S. 568, 584–585, 81 S.Ct. 1860, 1869–70, 6 L.Ed.2d 1037 (1961). *See also McNabb v. United States*, 318 U.S. 332, 345, 63 S.Ct. 608, 615, 87 L.Ed. 819 (1943).

The defendants were arrested on Friday, March 2, 1990, and brought before the Magistrate on Monday, March 5, 1990. During the Oral Hearing in this case, the parties informed the Court that prior to the incarceration of the defendants in the State Penitentiary, a Magistrate signed and is-

sued a temporary commitment order on March 2, 1990, the date of the defendants' arrest.[7] We find that there was no unnecessary delay under these circumstances. Even if there had been unnecessary delay during the period of time in question, we find no purposeful postponement of the arraignment, and no lengthy, hostile, or coercive interrogation prejudicing the crewmen, so that suppression would not be proper. *United States v. Beltrán*, 761 F.2d 1, 8 (1st 1985).

### IV. CONCLUSION

Wherefore, in view of the foregoing, the defendants' motion to suppress the evidence is denied.

IT IS SO ORDERED.

---

**7.** The defendants stated that this practice is no longer followed by the Magistrates in this District. We note that the Temporary Commitment Order is not part of the record in this case.