UNITED STATES of America, Plaintiff-Appellee,

v.

James Michael THOMPSON, Defendant-Appellant.

No. 89–6301.

United States Court of Appeals, Eleventh Circuit.

April 17, 1991.

---

Thomas F. Almon, Miami, Fla., for defendant-appellant.

Dexter W. Lehtinen, U.S. Atty., Donnal S. Mixon, Linda Collins Hertz, Dawn Bowen, Carol E. Herman, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before KRAVITCH and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

COX, Circuit Judge:

On October 30, 1988, a boarding party from the Coast Guard cutter TAMPA conducted a documents and safety inspection of the vessel MOLLY BETH[1] in the Windward Passage. The Coast Guard found 412 kilograms of cocaine hidden in secret compartments. James Michael Thompson, owner and captain of the MOLLY BETH, was charged with conspiracy to possess with intent to distribute cocaine while on board a United States vessel, 46 U.S.C.App. § 1903(j), and possessing with intent to distribute cocaine while on board a United States vessel, 46 U.S.C.App. § 1903(a). Thompson sought to suppress the cocaine seized by the Coast Guard. The district court denied his motion to suppress. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Thompson was the owner and captain of the MOLLY BETH. The MOLLY BETH is a 41–foot cabin cruiser-trawler registered as a United States vessel. On October 30, 1988, Thompson and a female companion were traveling on the MOLLY BETH through the Windward Passage, approximately 500 miles from the United States.[2] At about 6:30 P.M., the Coast Guard cutter TAMPA intercepted the MOLLY BETH. The Coast Guard requested permission to board the vessel to conduct a documents

---

1. Thompson had recently purchased the boat. It was registered as the CHEZ JAY. He was in the process of changing the name to the MOLLY BETH when this incident occurred.

2. The district court took judicial notice that the Windward Passage is the most common route taken by drug smugglers in the Western Hemisphere. R.2–183.

and safety check. Thompson agreed to the inspection and a party of four men from the TAMPA boarded the MOLLY BETH. The members of the boarding party were Ensign Brewer, Chief Petty Officer Henderson, Petty Officer Fehnel and Petty Officer Nepert.

Once aboard, Brewer asked Thompson whether anyone else was on board. Thompson said that he had a female friend on board. Brewer then asked Thompson whether he had any firearms on board. Thompson said he did and the female companion showed Fehnel where the firearms were located. Brewer then asked Thompson to produce the vessel's documentation. At this point the other three Coast Guard officers began a safety check of the vessel. A safety check requires the officers to locate and examine all safety equipment on board a vessel. Since Thompson had recently purchased the boat, he was unfamiliar with the location of the various safety devices and thus could not help the officers locate the equipment.

Henderson began his safety check in the aft section of the boat. While there he noticed that the forward bulkhead of the lazaret (bathroom) had been replaced with a new section of plywood and held in place with fiberglass resin of a different character than in other parts of the boat. Additionally, Henderson noticed that there was some unaccounted-for space in the aft cabin. Henderson found that a compartment usually used for storing equipment had been sealed off by a wood panel held in place by screws and nails. Henderson was unable to remove the panel.

At the same time Henderson was conducting a safety check in the aft section of the boat, Fehnel was conducting a search in the forward section of the boat. Fehnel began his check by examining the compartment where the anchor chains were stored. Fehnel then moved to the middle of the forward cabin, which contains two v-berths. Fehnel examined some of the equipment on the bunks and then began to examine a standard storage compartment under the berths. Fehnel lifted one of the v-berth mattresses and found the hatch to the compartment. He removed the hatch and observed several pieces of equipment including some life preservers and sails.

Fehnel also observed that the compartment had been reduced in size. He noticed a strong smell of fiberglass and saw that the bottom of the compartment was constructed differently than the rest of the compartment. He observed that the fiberglass on the bottom of the compartment contained bubbles and was soft, indicating that the fiberglass had been recently installed in a hurried manner. Fehnel attempted to find access to the hidden part of the compartment but could not. He then concluded that the compartment contained unaccounted-for space.

Fehnel informed Henderson of this unaccounted-for space. Henderson examined the compartment and came to the same conclusion. Henderson asked Thompson if there was any way to access this part of the compartment. Thompson said he did not know of any access and did not know what was in that space. Henderson asked that the TAMPA send over a drill and a fiber optic scope. Brewer and Henderson then drilled a small hole into the hidden compartment and inserted the fiber optic scope. The boarding party, using the optic scope, could not see what was in the compartment because some type of white object was blocking their view. At this point, the boarding party decided to cut a larger hole so that a hand could be inserted into the compartment. After the hole was cut, Henderson and Brewer observed a white fabric covering a large number of brick-shaped objects. One of the bricks was opened and a brownish white powder was found. This powder was tested and determined to be cocaine.

At about the same time the boarding party discovered the cocaine in the hidden compartment, Thompson made an incriminating statement to Fehnel. Thompson stated, "Do you want to put the handcuffs on me now?" Fehnel then asked Thompson whether he had any illegal drugs on board. Thompson replied that he had two hundred kilograms of cocaine in the front of the boat and two hundred kilograms in

the back of the boat. Thompson was placed under arrest and transferred to the TAMPA. The Coast Guard took Thompson, his female companion and the MOLLY BETH to Miami. A full search of the MOLLY BETH ultimately revealed 412 kilograms of cocaine hidden on the boat.

Thompson was indicted on one count of conspiracy to possess with intent to distribute while on board a United States vessel at least five kilograms of cocaine, 46 U.S.C. App. § 1903(j), and one count of possessing with intent to distribute while on board a United States vessel at least five kilograms of cocaine, 46 U.S.C.App. § 1903(a). Thompson moved to suppress the 412 kilograms of cocaine claiming that the Coast Guard's search of his boat violated the Fourth Amendment's prohibition against unreasonable searches and seizures. Additionally, Thompson claimed the Coast Guard violated the Geneva Convention on the Territorial Sea and the Contiguous Zone[3] by boarding his vessel.

The district court held an evidentiary hearing on the motion to suppress. The government introduced the testimony of the four Coast Guard officers who were members of the boarding party. The court denied Thompson's motion. The court found that Fehnel, while statutorily authorized to be on board the boat, developed reasonable suspicion of criminal activity (drug smuggling). R.2–178. According to the court, this reasonable suspicion authorized the Coast Guard to search the storage compartment and ultimately drill and cut a hole into the hidden compartment. *Id.* at 182.

Additionally, the court held: first, that Thompson did not have any expectation of privacy in the storage compartment searched by the Coast Guard; and, second, that after searching the storage compartment the Coast Guard had reasonable suspicion of criminal activity allowing them to search the hidden compartment. *Id.* at 183. The court further held that Thompson did not have standing to challenge the search of the boat on the grounds that the search violated the Geneva Convention on the Territorial Sea and Contiguous Zone. R.2–185. The court determined that because the treaty was not self-executing, creating enforcement rights in favor of private citizens, Thompson did not have standing to allege a violation of the treaty. *Id.*

Following the denial of his motion to suppress, Thompson entered a conditional plea of guilty to both counts of the indictment, reserving the right to appeal the court's denial of his motion to suppress pursuant to Federal Rule of Criminal Procedure 11(a)(2).[4] Thompson now appeals the court's denial of his motion.

## II. STANDARD OF REVIEW

In cases involving the denial of a motion to suppress, we are bound by the district court's factual determinations unless they are clearly erroneous. *United States v. Morales,* 889 F.2d 1058, 1059 (11th Cir. 1989). As we recently stated:

> Absent clear error, we are bound by the district court's findings of fact and credibility choices at the suppression hearing. We construe all facts in the light most favorable to the prevailing party.... A finding of fact is clearly erroneous only when we are left with a definite and firm conviction that a mistake has been committed.

*United States v. Roy,* 869 F.2d 1427, 1429 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989). However, we "independently apply legal principles to the district court's findings of fact." *Id.*

## III. DISCUSSION

### A. Safety and Documents Inspection

The district court held that the Coast Guard officers had a reasonable suspicion

---

3. 15 U.S.T. § 1606 TIAS No. 5639 (entered into September 10, 1964).

4. Fed.R.Crim.P. 11(a)(2) provides:
   **Conditional Pleas.** With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from judgment, to review of the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

that criminal activity was occurring and this reasonable suspicion permitted the Coast Guard to examine the storage compartment. R.2-178. After searching the storage compartment the Coast Guard strengthened its reasonable suspicion and thus was permitted to drill a small hole and later cut a larger hole into the hidden compartment. *Id.* The district court found as an alternative basis for its decision that Thompson had no reasonable expectation of privacy in the storage compartment searched and therefore could not challenge the search of that compartment, and that the search of the storage compartment gave rise to reasonable suspicion justifying entry into the hidden compartment. *Id.* at 183. We agree with the district court that Thompson did not have any expectation of privacy in the storage compartment and therefore cannot challenge the search of the compartment.[5] While the district court determined that after Fehnel completed his inspection of the storage compartment the Coast Guard had a reasonable suspicion that criminal activity was occurring, we believe that the Coast Guard had probable cause to believe criminal activity was occurring. The Coast Guard, based upon having probable cause, was then constitutionally permitted to expand its search and drill into the hidden compartment.[6]

Thompson challenges the Coast Guard's search of his vessel and the seizure of the cocaine hidden on the boat as a violation of his Fourth Amendment rights.[7] "Since the Supreme Court's decision in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)," to determine whether a defendant may challenge a search and seizure as a violation of his Fourth Amendment rights "the correct inquiry is no longer whether an individual has standing to challenge a search separate and apart from the merits of his challenge. Instead, the analysis should proceed directly to the issue of whether the individual maintains a legitimate expectation of privacy in the object of the search." *United States v. McBean,* 861 F.2d 1570, 1573 (11th Cir.1988); *see also United States v. Lopez,* 761 F.2d 632, 635 (11th Cir.1985) (citations omitted). The individual must "manifest 'a subjective expectation of privacy in the object of the challenged search.' " *McBean,* 861 F.2d at 1573. This expectation of privacy must be one that society is prepared to recognize as legitimate and reasonable. *Id.* at 1573 n. 7.[8]

■ At sea, a person's expectation of privacy may be severely restricted compared with expectations of privacy on land. *United States v. Lopez,* 761 F.2d 632, 635 (11th Cir.1985). One reason for this lower expectation of privacy at sea is that the Coast Guard is statutorily authorized to board a United States vessel and conduct a documents and safety inspection pursuant to 14 U.S.C. § 89(a).[9] The Coast Guard

5. Because we conclude that the district court correctly determined that Thompson did not have a reasonable or legitimate expectation of privacy in the storage compartment, we need not discuss the court's conclusion that Fehnel had a reasonable suspicion of criminal activity which authorized him to search the storage compartment.

6. Because we conclude that the Coast Guard had probable cause to believe criminal activity was occurring, we need not discuss whether a reasonable suspicion would be sufficient to permit such a search. *See United States v. Morales,* 889 F.2d 1058, 1059-60 (11th Cir.1989) (a limited search in which the Coast Guard lifted the carpeting and floorboards from the floor of the main berthing cabin of the boat to examine an inaccessible area need only be based upon a reasonable suspicion of criminal activity).

7. The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV.

8. The government argues on appeal that an individual can neither have a legitimate nor reasonable expectation of privacy in a hidden compartment. We need not address that issue in deciding this case.

9. 14 U.S.C. § 89(a) provides:
The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression

may stop a vessel and conduct such an inspection even without suspicion of criminal activity. *United States v. Thompson,* 710 F.2d 1500, 1505 (11th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 730, 79 L.Ed.2d 190 (1984) (citation omitted).

As a result of the Coast Guard's authority to board a vessel and conduct a documents and safety inspection, we have held that an individual cannot have a reasonable expectation of privacy in any area that the Coast Guard is authorized to inspect pursuant to a section 89(a) documents and safety check. *Id.* at 1506. We also noted that " 'no one ... could conceivably have any legitimate expectation of privacy with regard to any object that would be in the plain view (or smell) of someone' conducting a safety or documents check." *Id.* at 1505 (*quoting United States v. Williams,* 617 F.2d 1063, 1086 (5th Cir.1980) (*en banc* )). Our cases, however, have repeatedly emphasized that the Coast Guard may not rummage through the private areas utilized by the boat's crew, such as footlockers, knapsacks or duffel bags, while conducting a safety and documents inspection. *United States v. Morales,* 889 F.2d 1058, 1060 (11th Cir.1989); *United States v. De Weese,* 632 F.2d 1267, 1271 (5th Cir.1980),[10] *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981).

■ Under the facts of this case, we conclude that Fehnel was authorized by section 89(a) to search the storage compartment under the v-berths. Fehnel was conducting a safety inspection. A safety inspection requires the officer to physically examine all the safety equipment on board the vessel. Such equipment includes fire extinguishers, flares, life jackets and any other equipment required by Coast Guard regulations to be on board the boat.

Henderson stated that Thompson, because he recently purchased the vessel, could not help the boarding party locate the safety equipment. R.2–59. Therefore, the Coast Guard was authorized to actively search for the safety equipment in the various parts of the boat. *United States v. Roy,* 869 F.2d 1427, 1432 n. 7 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989) ("[W]hen the required safety equipment, such as fire extinguishers, life preservers, or visual distress signals are not apparent on deck, the Coast Guard is permitted to go below to determine whether the equipment is present and in good repair.").

■ Fehnel's testimony establishes that the area in question was a standard storage compartment. R.2–92. Fehnel also testified that he examined the compartment as part of his normal inspection procedure. *Id.* at 73, 91–92. According to Fehnel, the compartment was designed to store the boat's equipment and on most boats that is how it is used. *Id.* at 92. Consistent with Fehnel's testimony, the compartment searched did not contain *personal* items belonging to Thompson but did contain part of the boat's standard equipment, specifically some life jackets and sails. *Id.* at 92–93. Based on Fehnel's testimony and these other factors we are unwilling to conclude that the storage compartment was a private area not subject to inspection

of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or

if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

10. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

during a documents and safety check. The storage compartment searched is unlike a personal knapsack or duffel bag. The storage compartment, while below the v-berth mattress, is primarily used to hold the boat's equipment, not personal items. Therefore, a reasonable person would conclude that the compartment *may* contain safety equipment, while a knapsack or duffel bag would not be a logical place location to look for safety equipment.[11]

Thus, the compartment was an area rightfully inspected by Fehnel during his safety inspection.[12] Because Fehnel was authorized to search the compartment during his safety inspection, Thompson cannot have any legitimate or reasonable expectation of privacy in the compartment.

■ We believe that after Fehnel inspected the storage compartment, he acquired probable cause that allowed the Coast Guard to expand its search of the vessel to include examining and determining the contents of the hidden compartment. *United States v. Roy*, 869 F.2d 1427, 1431–32 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989); *United States v. Lopez*, 761 F.2d 632, 636 (11th Cir.1985). We find that the presence of unaccounted-for space, the fresh smell of fiberglass, the bubbled composition of the fiberglass resin, the location of the hidden compartment, and the location of the boat in the Windward Passage, constituted probable cause which authorized the Coast Guard to examine the hidden compartment.

We, therefore, conclude that Fehnel's search of the storage compartment and the subsequent search of the hidden compartment by the boarding party did not violate Thompson's Fourth Amendment rights.

## B. The Treaty

■ Thompson also argues that the Coast Guard's boarding and search of his vessel violated the Geneva Convention on the Territorial Sea and the Contiguous Zone, 15 U.S.T. Section 1606, TIAS No. 5639, article 24 (September 10, 1964). We have held that a treaty must be self-executing in order for an individual citizen to have standing to protest a violation of the treaty. *United States v. Bent–Santana*, 774 F.2d 1545, 1550 (11th Cir.1985); *United States v. Conroy*, 589 F.2d 1258 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). A treaty is self-executing if it creates privately enforceable rights. *Bent–Santana*, 774 F.2d at 1550. We agree with the district court that the treaty in question does not create any privately enforceable rights and therefore is not self-executing. Because the treaty is not self-executing Thompson does not have standing to protest an alleged violation of the treaty.

## IV. CONCLUSION

We agree with the district court that no violation of Thompson's Fourth Amendment rights occurred and that Thompson does not have standing to challenge a violation of the Geneva Convention on the Territorial Sea and the Contiguous Zone. Therefore we AFFIRM the district court's denial of Thompson's motion to suppress the 412 kilograms of cocaine seized.

AFFIRMED.

---

11. We agree with the First Circuit's conclusion that a safety and documents check "does not authorize Coast Guard officers to explore a vessel beyond the search reasonably incident to a safety and documents inspection and it assuredly does not give [the Coast Guard] carte blanche to search private books, papers or other effects ... not related to the purposes of such an inspection." *United States v. Hilton*, 619 F.2d 127, 132 (1st Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980).

12. Thompson complains that the Coast Guard was on board his vessel for over one and one-half hours before Fehnel looked into the compartment. He argues that such a period is too long for the Coast Guard to conduct a documents and safety inspection. The Coast Guard is permitted to remain on board a vessel until their inspection is completed. *See United States v. Troise,* 796 F.2d 310, 313 (9th Cir.1986). Nothing in the record indicates that the Coast Guard had completed its inspection by the time Fehnel looked in the compartment.