UNITED STATES of America, Appellee,

v.

Joaquin CARDONA–SANDOVAL, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alejandro ROJANO–RANGEL, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jorge GÓMEZ–OLARTE, Defendant, Appellant.

Nos. 92–1385 to 92–1387.

United States Court of Appeals, First Circuit.

Heard Jan. 4, 1993.

Decided Sept. 29, 1993.

David W. Román, San Juan, PR, by appointment of the Court, for appellant Joaquín Cardona–Sandoval.

Juan R. Acevedo–Cruz, Carolina, PR, by appointment of the Court, with whom Charles A. Rodríguez, Hato Rey, PR, was on brief, for appellants Jorge Gómez–Olarte and Alejandro Rojano–Rangel.

Jeanette Mercado–Ríos, Asst. U.S. Atty., with whom Daniel F. López–Romo, U.S. Atty., and José A. Quiles–Espinosa, Sr. Litigation Counsel, Hato Rey, PR, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

## AMENDED OPINION

TORRUELLA, Circuit Judge.

This appeal involves the validity of a search of a vessel. Appellants Joaquín Cardona–Sandoval, Alejandro Rojano–Rangel, and Jorge Gómez–Olarte appeal their convictions of possessing cocaine with intent to distribute it in violation of 46 U.S.C.App. § 1903(a), (b)(1), and (f). For the reasons that follow, we reverse the convictions.

## I

The facts are set forth in the light most favorable to the government. Appellants Cardona–Sandoval (the captain), Rojano–

Rangel and Gómez–Olarte (the crew),[1] were on board a forty-three foot sports-fisherman, Florida registration Number "FL 8304 EM"[2] allegedly on route from Colombia, South America to St. Maarten. All appellants are Colombian nationals.

On February 25, 1990, they were intercepted by the U.S.S. BIDDLE, a Navy destroyer. The U.S.S. BIDDLE was charged with boarding northbound vessels of less than four hundred feet as part of the government's drug interdiction program. Coast Guard officials aboard the U.S.S. BIDDLE were to conduct the boardings and investigations.[3]

Following standard procedure, the U.S.S. BIDDLE attempted radio and loudspeaker communication with FL 8304 EM in both English and Spanish, but the vessel never responded. The U.S.S. BIDDLE then dispatched a six-member boarding party to conduct a document and safety inspection. The crew did not object to this inspection.

This initial boarding lasted approximately two hours. Two members of the boarding party guarded the captain and crew at the stern of the vessel while four others checked it for compliance with safety regulations. They also conducted a so-called space accountability search to ensure that the vessel was not compartmentalized secretly for smuggling. During the inspection, the captain, Cardona–Sandoval, stated that Roberto de Armas owned the vessel and that appellants were employed to bring the boat from Colombia to St. Maarten. The registration document, however, indicated that Luis Rodríguez owned the boat. Cardona–Sandoval claimed not to know Rodríguez.

As the space accountability search neared completion, one of the junior officers asked the senior officer leading the boarding party, Petty Officer William Ronald Spake, to personally inspect certain areas that appeared suspicious. The areas included a newly-constructed shower; several walls that appeared thicker than necessary, according to the petty officer's prior experience; and a large water tank. Spake indicated that the generally "messy" state of the boat made him suspicious, as well, but after two hours of searching, no contraband was discovered. He then cited vessel master Cardona–Sandoval with a minor violation—for producing a photocopy of the boat's registration rather than the original—and conferred with his superior aboard the U.S.S. BIDDLE, Lieutenant George Boyle. The two agreed that they had completed the space accountability search to the best of their ability. Lt. Boyle directed the boarding party to report back to the U.S.S. BIDDLE and, thereafter, the Coast Guard allowed appellants to continue their voyage.

That evening the boarding party and Lt. Boyle assembled for debriefing. The team made several observations: (1) that recent reconstruction had been done on the vessel; (2) that appellants were from a known drug source country; (3) that the sleeping cabins were in disarray, which suggested to the Coast Guard that the crew slept on the deck; (4) that the boat had been painted recently and the paint was peeling; and, (5) that the United States flag was not displayed as it should have been. In addition, one member of the party had become ill during the search, and the officer who replaced him failed to continue the search exactly where the other officer had left off. Lt. Boyle determined that the boarding party had failed to search adequately the space behind the medicine cabinet and the reconstructed shower area, and decided to reboard FL 8304 EM to complete the space accountability search. The record indicates a controversy regarding the real impetus for the second search.[4]

---

1.  The third crew member, Alfonso Molina, was acquitted at trial.

2.  The parties stipulated that the vessel was subject to the jurisdiction of the United States.

3.  Pursuant to 10 U.S.C. § 379(a) (Supp.1992), Coast Guard officials may be assigned to duty aboard Navy vessels to perform drug interdic-tion. *See United States v. Sandoval,* 770 F.Supp. 762, 767 (D.P.R.1991).

4.  *See United States v. Sandoval,* 770 F.Supp. at 766 (stating Boarding Report of February 25, 1990 cited medicine cabinet on bulkhead as reason for reboarding; and rejecting the magistrate's finding that the water tank was a *specific* reason for the second boarding).

In addition, sometime on February 25, 1990, Lt. Boyle learned: (1) that the El Paso Intelligence Center ("EPIC") indicated that the captain had been convicted of smuggling marijuana in 1984; (2) that FL 8304 EM was also known as the "Wicho" and was on the EPIC lookout list as possibly having hidden compartments for smuggling; and (3) that EPIC had information on both Roberto de Armas and Luis Rodríguez. Because Lt. Boyle failed to note or was unable to recall the exact time that he received the EPIC information, we do not know whether the Coast Guard possessed this information during the initial search.

On the morning of February 26, 1990, a Navy aircraft located the FL 8304 EM on a course 100 degrees different from the day before. The Coast Guard testified that although conditions at sea had deteriorated considerably, the change in course was not justified by the weather. The Coast Guard inferred that FL 8304 EM had taken evasive action.

Although the Coast Guard justified the second boarding as required by the need to complete the space accountability search, the search actually conducted was much broader than initially proposed. In fact, the second search lasted approximately five hours. During that time, the boarding party used an axe and a crowbar to further investigate the shower area and space underneath the water tank. No contraband was found.

Ultimately, the Coast Guard determined that the seas were too rough to continue the search at sea and they decided to take the vessel and its crew to the Roosevelt Roads Naval Base at Ceiba, Puerto Rico, in order to continue the search. Appellants were transferred to the U.S.S. BIDDLE, allegedly for their safety, and Coast Guard personnel piloted FL 8304 EM back to Puerto Rico. The district court found that appellants did not consent to be taken to Puerto Rico. *Id.* at 766.

On February 27, while in transit to Puerto Rico, Lt. Boyle inspected the FL 8304 EM personally, and reaffirmed the decision to bring the vessel to shore because certain spaces, such as the water tank (which was welded to the ribs of the vessel), could not be accessed at sea without the risk of sinking the boat.

On February 28, the vessel arrived in Puerto Rico. Navy divers and a narcotics search dog were brought to search the vessel, but detected nothing. The Coast Guard stated that there were too many things strewn over the deck that interfered with the dog's olfactory sense. The water tank was then removed from the boat, and the gasoline tank was emptied. Notwithstanding this search, at the end of the day no contraband had been found. Lt. Boyle transferred custody of the FL 8304 EM to Lt. J.G. Gatlin of the San Juan Coast Guard Law Enforcement attachment.

On March 1, the FL 8304 EM was removed from the water. At this point a destructive search began in earnest. The poor condition of the deck and other factors that suggested that it might have been raised to create hidden spaces, prompted the Coast Guard to use a chainsaw to cut through the deck in search of narcotics. The ceilings and walls of the cabins were pulled down and thoroughly searched. Gatlin and his team discovered a grinder which could be used to cut fiberglass, as well as cushions on the deck filled with fiberglass shavings, suggesting that fiberglass molding work had been done recently. Nevertheless, by the end of the day no illicit substances had been found on the FL 8304 EM.

The government did not give up. The search continued on March 2nd. That afternoon, the search team drilled into two beams that ran the length of the vessel and upon which the engine was mounted. Cocaine was found there. Yet it took the search team even more time to find the place from which the cocaine could be accessed. Using an axe and crowbar, the officers worked for several minutes to open an access point.

After the U.S.S. BIDDLE and FL 8304 EM arrived at Roosevelt Roads Naval Station on February 28, appellants were detained at the base for six hours under guard, during which time they received no food. Subsequently, they were transferred to Immigration and Naturalization Service ("INS") custody and moved to the airport in San

Juan where they were detained for three hours in a locked room. Thereafter they were handcuffed and transported to the INS detention facilities at the Salvation Army in San Juan, where they were placed in a large locked room, which resembled a cage. There, they were detained during the three-day on-land search until 5:00 P.M. on March 2, 1990 when they were formally arrested.

After their arrest, appellant Cardona–Sandoval explained to United States Customs Special Agent Roberto Jusino that he had been hired by Roberto de Armas in Barranquilla, Colombia to pick up FL 8304 EM at Río Hacha, Colombia and take it to St. Maarten. He was to be paid 80,000 Colombian pesos for the job. Similarly, appellant Rojano–Rangel stated that he had been hired by Cardona–Sandoval as a crew member for 60,000 pesos. During the trial, the prosecution and several witnesses incorrectly stated the compensation in dollars, when they actually meant pesos. Because the words peso and dollar are used interchangeably in Puerto Rico to mean United States dollars, the parties stipulated at a later point in the trial that any reference to United States dollars was incorrect and that the correct reference was to Colombian pesos. Agent Jusino testified at trial that the exchange rate for Colombian pesos was very low, but did not testify as to the value of the compensation in American dollars. Appellants attempted to introduce expert testimony on the exchange rate but the district court denied their proffer, finding the witness they attempted to use unqualified to testify on such matters.

## II

Appellants challenge their convictions on several grounds. They allege that the district court improperly denied their motion to suppress evidence seized during the search of their vessel, which they claim was in violation of their Fourth Amendment rights. Alternatively, they argue that the evidence was insufficient to support the guilty verdicts. They also contend that the district court committed reversible error by refusing to voir dire the jury regarding their knowledge of two prejudicial newspaper articles published during the deliberations, and by refusing to admit the testimony of a defense expert witness as to the exchange rate between the Colombian peso and the United States dollar.

The district court denied the motion to suppress the evidence seized from the vessel, holding that (1) the cocaine seized was not the fruit of an illegal arrest; (2) the appellants did not have standing to challenge the search and seizure because they had no privacy interest in the structural beams along the hull of the vessel; and (3) the Coast Guard had probable cause to bring the ship to Roosevelt Roads for a destructive search. *United States v. Sandoval,* 770 F.Supp. at 766–67. Although we disagree with the district court's conclusion that appellants were not under arrest once they were brought to Puerto Rico and placed in a holding cell for approximately three days while their vessel was searched, we agree that the cocaine seized cannot be considered the fruit of that illegal arrest. We focus, therefore, on the issues related to the search of the vessel.

## III

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...."[5] An individual's Fourth Amendment right to be free from unreasonable searches is implicated when he or she (1) has "manifested a subjective expectation of privacy" in the place searched, which (2) "society accepts as objectively reasonable." *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); *see also O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987); *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

To demonstrate a "subjective expectation of privacy," the Court has required little more than evidence that defendants made

---

**5.** *United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 1060, 108 L.Ed.2d 222 (1990), has no application because the vessel was a United States flag ship and the violation occurred within United States territory. *Cf. United States v. Aikins,* 946 F.2d 608, 613 (9th Cir.1990).

some minimal effort to protect their property or activities from warrantless intrusions. *See, e.g., Greenwood,* 486 U.S. at 39, 108 S.Ct. at 1628 (placing garbage in opaque plastic bags "clearly" manifests "subjective expectation of privacy," even though bags are later publicly discarded); *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986) (building ten-foot fence around yard manifests "subjective expectation of privacy" from side walk traffic). *But cf. Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980) (placing contraband in acquaintance's purse does not manifest "subjective expectation of privacy").

There is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor,* 480 U.S. at 715, 107 S.Ct. at 1496. The reasonableness of an expectation of privacy and the proper standard for a search vary according to context. *Id.* While "arcane distinctions developed in property and tort law" do not control the inquiry, *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), we do consider ownership, possession, control, ability to exclude from the premises, or a legitimate presence on the premises when determining the existence of a legitimate expectation of privacy. *United States v. Melucci,* 888 F.2d 200, 202 (1st Cir.1989); *United States v. Aguirre,* 839 F.2d 854, 856 (1st Cir.1988). In addition, because of the "circumstances and exigencies of the maritime setting," we have recognized that individuals have a diminished expectation of privacy on a vessel as opposed to that which can be claimed in their homes. *See, e.g., United States v. Green,* 671 F.2d 46, 53 (1st Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *United States v. Hilton,* 619 F.2d 127, 131 (1st Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). Finally, we note that "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). With these principles as background, we turn to the facts of the present case.

Appellants must be divided into two groups for the purpose of measuring the legitimacy of their expectation of privacy: the captain and the crew members. The captain, Cardona–Sandoval, has a cognizable expectation of privacy from unauthorized police intrusions everywhere aboard his ship. This interest derives from his custodial responsibility for the ship, his associated legal power to exclude interlopers from unauthorized entry to particular places on board, and the doctrines of admiralty, which grant the captain (as well as the owner) a legal identity of interest with the vessel. *See, e.g., The Styria,* 186 U.S. 1, 22 S.Ct. 731, 46 L.Ed. 1027 (1902); *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir.1986); *United States v. Aikens,* 685 F.Supp. 732, 736 (D. Hawaii 1988), *rev'd on other grounds,* 946 F.2d 608 (9th Cir.1990); *see generally* 1 Martin J. Norris, *The Law of Seamen* §§ 25:1 *et seq.* (4th ed. 1985 & supp. 1993) (describing broad powers of master of vessel). Cardona–Sandoval objected to having his boat taken to Puerto Rico for a destructive search, and therefore manifested his subjective expectation of privacy in the vessel. It is appropriate to conclude that Cardona–Sandoval's subjective expectation that he, his vessel and crew, not be taken from the high seas, brought to a country which he did not care to enter, subjected to a six-day search (three of which occurred on land and constituted a destructive search), and detained in a barred cage while the government destroyed the vessel, is one that society is prepared to recognize as reasonable. Thus, in his capacity as master of the vessel, Cardona–Sandoval has a Fourth Amendment right to challenge the searches in this case. *See United States v. Marrero,* 644 F.Supp. 570, 574 (S.D.Fla.1986) (defendant who was owner and captain has Fourth Amendment right to contest search).

Whether the crew members' expectation of privacy is objectively reasonable is a more difficult question. A number of cases have limited the areas of a vessel in which crew members legitimately possess an expectation of privacy. *See United States v. Arra,* 630 F.2d 836, 841 n. 6 (1st Cir.1980) (questioning, without deciding, whether crew

members have right to challenge search in areas other than living quarters); *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir.1987) (crew has no privacy interest in cargo hold); *United States v. Thompson*, 928 F.2d 1060, 1065 (11th Cir.) (recognizing difference between private areas or footlockers versus cargo holds), *cert. denied*, —— U.S. ——, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991). The underlying principle of these cases is that a crew member cannot have an expectation of privacy in a space that the Coast Guard is free to inspect in the course of a document and safety check. Obviously, contraband that the Coast Guard observes within plain view (or detects by sensory perception) while searching the cargo hold is not within an area in which crew members could have a reasonable or legitimate privacy interest. *Thompson*, 928 F.2d at 1064. This, of course, would apply to the captain as well.

■ We think that cases involving substantial vessels, such as cargo ships and freighters, must be distinguished from the case at hand. It is quite understandable that in dealing with a major vessel, a court should distinguish among areas, treating some as not susceptible to a reasonable expectation of privacy by a crew member. For example, the short hand designation of a freighter's cargo hold as a common area, in which no crew member could possess a reasonable expectation of privacy, is not objectionable in the factual context of those cases by reason of the size of the vessel and the de facto limitation of space which the crew member can claim as private.

■ But our case involves entirely different factual circumstances. Here, we confront a small pleasure craft used for fishing. The vessel's compartments were small and cramped, and the crew numbered only four. There was no practicable means to exclude members of the crew from specific areas of the vessel. Like hosts and their overnight guests in a small apartment, the captain and crew members, each individually, possessed a reasonable expectation of privacy in all areas

of the vessel with respect to all individuals not living within the unit and sharing the space. This sharing of limited space and lack of demarcation is the reality of life upon a small boat.

In such a vessel there are no "common areas" in the same sense that the cargo hold or dining room on a large boat are public or common. The fact that several individuals may share the limited space no more makes the space public than would the fact that a family may share a house or a hotel room. We cannot lay down a yardstick for every case, but we think that this case is at the other pole from the freighter or cruise vessel where an individual's private space can meaningfully be distinguished from areas that are public or common. In sum, we think that the crewmen in this case, like the captain, are entitled to raise the question whether the search of the ship was unreasonable.[6]

To the extent that Fifth and Eleventh Circuit cases may be read to dictate a different result for small vessels, we decline to follow them. *See, e.g., United States v. López*, 761 F.2d 632, 636 (11th Cir.1985) (suggesting methodological approach that confers or rejects right to contest search according to function of specific compartments within a vessel, such as cargo hold or living quarters); *United States v. DeWeese*, 632 F.2d 1267, 1271 (5th Cir.1980) (ice hold common area; dufflebags and footlockers private areas).

Of course, the captain and crew's expectations of privacy is subject to the Coast Guard' authority to conduct document and safety inspections and its limited power to search more intrusively upon reasonable suspicion. But this is not inconsistent with recognizing that the crew, like the captain, still retains privacy interests that go beyond the wallet or footlocker. Rather, it means that in determining what is reasonable behavior by officials, there is a latitude that reflects the mobility of the vessel, the special dangers of sea travel and other considerations peculiar to sea travel. But that latitude is not unlimited and we turn now to the

---

**6.** In equity, one might argue that the crew deserves at least as much protection as the captain, for the captain is the person most likely to be trusted with the knowledge of the presence of

contraband, and is also the most likely leader of the criminal enterprise. But standing rules do sometimes produce odd outcomes and we note this point without relying upon it for our holding.

question whether in this case the government overstepped the bounds.

### IV

■ The Coast Guard's authority under 14 U.S.C. § 89(a)[7] to stop and board an American vessel on the high seas[8] is quite broad. We have held that administrative safety and document inspections are permissible even "without any particularized suspicion of wrongdoing." *United States v. Elkins*, 774 F.2d 530, 533–34 (1st Cir.1985) (quoting *United States v. Burke*, 716 F.2d 935, 937 (1st Cir.1983)). Despite this empowerment, the Fourth Amendment still prohibits unreasonable searches. The reasonableness of any search depends first on "whether the ... action was justified at its inception," *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), and second, on whether the search actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.; see also New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985).

■ Because of the special circumstances implicated by searches and seizures of vessels while at sea, we have recognized a diminished expectation of privacy. *Green*, 671 F.2d at 53; *Hilton*, 619 F.2d at 131. Nevertheless, we require that the Coast Guard possess "reasonable and articulable grounds for suspecting that the vessel or those on board are engaging in criminal activities" before conducting a thorough search beyond checking for compliance with safety regulations. *Green*, 671 F.2d at 53 (citing *United States v. Williams*, 617 F.2d 1063, 1076, 1084 (5th Cir.1980)). The necessary

"reasonable suspicion" may be formed on the basis of facts obtained during the safety and document inspection, and once reasonable suspicion exists the inspecting officers may drill into a suspicious area to search for contraband. *Elkins*, 774 F.2d at 534. Both the document and safety inspection, and a search pursuant to reasonable suspicion, must be confined to areas reasonably incident to the purpose of the inspection. Therefore, a reasonable suspicion search only authorizes a limited intrusion. For example, if a particular area of a vessel raises a reasonable suspicion, then that area may be investigated further. *Id.* (suspicious fuel tank); *see also Lopez*, 761 F.2d at 636. Neither authority provides carte blanche to destroy a vessel. *See Hilton*, 619 F.2d at 132 (discussing scope of document and safety inspection).

■ In the maritime context, the relative intrusiveness of a search must be justified by a corresponding level of suspicion supported by specific facts gathered by investigating officials. *Cf. New Jersey v. T.L.O.*, 469 U.S. at 343–44, 347, 105 S.Ct. at 743–44, 745 (contemplating expanding scope of search where justified by facts giving rise to further reasonable suspicion); *United States v. Villamonte Marquez*, 462 U.S. 579, 592, 103 S.Ct. 2573, 2581, 77 L.Ed.2d 22 (1983). We recognize that by allowing each inspection to provide the basis for a more intrusive search—document and safety inspection supplying reasonable suspicion which later supports a probable cause determination—we risk manipulation by government officials of the factual progression that provided the authority for ever more intrusive searches. We think that this danger further justifies the deterrent supplied by

---

**7.** 14 U.S.C. § 89(a) provides, in relevant part: The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or the operation of any law, of the United States, address inquiries to those on board, examine the ships documents and papers, and examine, inspect, and search the vessel and use all necessary

force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be immediately pursued and arrested on shore, or other lawful appropriate action shall be taken....

**8.** The "high seas" are those waters "beyond the territorial seas of the U.S. and beyond the territorial seas of any foreign nation." 21 U.S.C. § 955b(b).

our holding with respect to standing. More intrusive searches that yield no contraband can halt the forward progression evidence that would justify a full, destructive search. Thus, if a document and safety inspection causes a Coast Guard officer to have reasonable suspicion with respect to certain areas, and a search of those areas yields nothing, then a destructive search might not be justified. *Cf. Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) ("warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation'") (citation omitted). Ultimately, a full, "stem to stern," destructive search may only be conducted on the basis of probable cause. *Lopez,* 761 F.2d at 636–37; *United States v. Andreu,* 715 F.2d 1497 (11th Cir.1983).

■ The facts of the present case provide a graphic illustration of the principles stated above. The initial boarding of the FL 8304 EM was for a perfectly legal document and safety inspection pursuant to 14 U.S.C. § 89(a). Petty Officer Spake issued a minor violation notice for failing to present the original copy of the vessel's registration papers. He felt that he was not authorized to proceed further with the search despite his "suspicion" regarding certain spaces. (Suppression Hearing Transcript, October 1, 1990, at 58). Matters changed, however, during the subsequent debriefing. Apparently, EPIC information was received regarding the vessel, the captain, and the two alleged owners. In addition, certain spaces purportedly had not been accounted for during the document and safety inspection. The sequence of these developments raises questions. The absence of adequate answers to these questions casts doubt on the validity of subsequent events.

After-the-fact rationalizing is precisely what makes the relaxed warrant and cause procedures such a dangerous tool in the hands of over-zealous officials. If we had a clear record establishing reasonable suspicion to reboard the FL 8304 EM based on specific factors, this action would be less troubling than it presently is. But in this case the record is unclear as to when specific pieces of information came to the attention of the Coast Guard, and on what basis the Coast Guard justified their actions.

■ The government's brief suffers from the same problem. For example, it suggests that the boarding party discovered fiberglass shavings in the cushions on the deck of the vessel, which added support for the second boarding and bringing the vessel to Puerto Rico. But our investigation of the record indicated that Lt. Gatlin's *on-land* inspection team did not discover the fiberglass until March 1. We cannot stress enough the importance of compiling a coherent and detailed record as to when facts are discovered and when the inferences and conclusions are drawn therefrom. A finding of guilt becomes irrelevant if the evidence upon which conviction is secured is not procured in a constitutional manner. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ Notwithstanding the abuse, we conclude that the second boarding and five-hour search was justified by reasonable suspicion rather than by the necessity of completing the document and safety inspection. The circumstances changed, however, once the FL 8304 EM arrived in Puerto Rico. The search by Navy divers and a narcotics detection dog, and the thorough and destructive inspection of many structural areas of the boat (including the suspicious shower area and water tank), dissolved any legally sustainable suspicion once reasonably held. At that point, all the government had to support a probable cause finding was the EPIC information, the course change, and the fact that the boat originated from a drug source country. Such evidence fails to support a finding of probable cause. In the absence of probable cause, the destructive stem to stern search was illegal, and any evidence discovered as a result of that excessively intrusive search should have been suppressed by the district court. *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 488.

V

*Conclusion*

Because we find that all the appellants had a reasonable expectation of privacy sufficient

to confer a right to challenge the search of the vessel, and because the search violated appellants' Fourth Amendment rights, the convictions must be reversed. We need not consider appellants' other arguments.

Appellants' convictions are *reversed.*

CYR, Circuit Judge (dissenting in part).

Although the stem-to-stern destructive search of the drydocked vessel exceeded whatever reasonable limits inhere in a safety and document inspection, I believe the defendant crew members failed to establish an intrusion on their Fourth Amendment rights.

As the Supreme Court recently reiterated, "a 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Soldal v. Cook County, Illinois,* — U.S. —, —, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)); *see also United States v. Bouffard,* 917 F.2d 673, 675–76 (1st Cir.1990); *United States v. Soule,* 908 F.2d 1032, 1034 (1st Cir.1990). The burden of establishing a protected Fourth Amendment privacy interest rests squarely with the individual defendant. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Bouffard,* 917 F.2d at 675 (quoting *Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978)). Accordingly, for more than a decade the Court has insisted that "the capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims [its] protection ... has a legitimate expectation of privacy *in the invaded place.*" *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430 (emphasis added); *see also California v. Greenwood,* 486 U.S. 35, 39–40, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988); *Rawlings,* 448 U.S. at 104–105, 100 S.Ct. at 2561–62; *United States*

*v. Salvucci,* 448 U.S. 83, 93, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980); *see generally United States v. Cruz Jimenez,* 894 F.2d 1, 5 (1st Cir.1990) ("Demonstration of a [legitimate expectation of privacy] is a *threshold* ... *requirement, and analysis cannot proceed further without its establishment.*") (emphasis added) (footnote omitted).[9]

In the present case, where no crew member asserts a possessory or proprietary interest in the vessel itself,[10] the establishment of a "legitimate expectation of privacy" turns upon two inquiries. First, we inquire whether there is any "long-standing social custom" which would substantiate a reasonable expectation of privacy on the part of the crew. *See, e.g., Minnesota v. Olson,* 495 U.S. 91, 98–99, 110 S.Ct. 1684, 1688–89, 109 L.Ed.2d 85 (1990) (houseguest's expectation of privacy); *O'Connor v. Ortega,* 480 U.S. 709, 717–18, 107 S.Ct. 1492, 1497–98, 94 L.Ed.2d 714 (1987) (public employees). Second, absent any such "longstanding social custom," we inquire whether the crew members had the right to exclude intruders from the area in or through which on-board access could be had to the property seized. *Compare United States v. Morales,* 847 F.2d 671, 672 (11th Cir.1988) (recognizing crew's Fourth Amendment right to challenge search of hidden compartment, since authorities gained access to hidden compartment through *crew's private quarters*), *with United States v. Lopez,* 761 F.2d 632, 635–36 (11th Cir.1985) (recognizing no Fourth Amendment right in hidden compartment, where authorities gained access through "common area" on deck of ship); *United States v. Sarda–Villa,* 760 F.2d 1232, 1236–37 (11th Cir.1985) (recognizing no Fourth Amendment right in hidden compartment underneath seats in main cabin of vessel).

The contraband seized from the vessel in the present case had been hidden in a hol-

---

**9.** Accordingly, I do not discuss the court's "probable cause" determination.

**10.** As the crew members presented no claim or evidence that their proprietary or possessory rights were violated by the seizure, we need not address separately their right to challenge the "seizure" of the vessel. Though the right to contest a "seizure" does not invariably require

that the moving party demonstrate a "reasonable expectation of privacy" in the place where the seizure occurred, *see Soldal,* — U.S. at — —, 113 S.Ct. at 545–46, at the very least the moving party must demonstrate a "possessory interest" in the property seized. *See id.* at —, 113 S.Ct. at 543 (quoting *Jacobsen,* 466 U.S. at 113, 104 S.Ct. at 1656).

lowed-out compartment within a structural beam running beneath the engine room. Unbeknownst to the Coast Guard, the secret compartment in the beam was accessible through the engine room.[11] *See, e.g., United States v. Marsh,* 747 F.2d 7, 11 (1st Cir.1984) (engine room as "common area"); *United States v. Stuart–Caballero,* 686 F.2d 890, 891–92 (11th Cir.1982) (same), *cert. denied,* 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983). Of course, it is clear that no "long-standing social custom" confers on *crew members* an "expectation of privacy" in the engine room or other "common areas" of a vessel. *See United States v. Arra,* 630 F.2d 836, 841 n. 6 (1st Cir.1980) ("areas subject to a safety inspection, such as the engine room ... are places where ... the crew of a vessel would have little if any expectation of privacy"); *see generally, e.g., United States v. Green,* 671 F.2d 46, 53 (1st Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982) (noting diminished expectation of privacy on maritime vessels). It is possible, as the majority suggests, that the master may have an expectation of privacy from unauthorized official intrusions in the engine room, or elsewhere aboard the vessel. *See* op. at 21–22; *see also United States v. Aikens,* 685 F.Supp. 732, 736 (D. Hawaii 1988) (master's "total control is consistent with the recognition of a privacy expectation which emerges from such authority"), *rev'd on other grounds,* 946 F.2d 608 (9th Cir.1990); *see generally* 1 Martin J. Norris, *The Law of*

*Seamen* §§ 25:1 *et seq.* (4th ed. 1985 & 1993 supp.) (discussing scope of master's authority aboard ship). But crew members cannot base an asserted "reasonable expectation of privacy" on that of the captain, even though, as coconspirators, their subjective interests in preventing governmental access to the hidden compartment and its contents may have been entirely compatible with the captain's interests.[12]

Turning to the second inquiry, it is clear that admiralty law confers no right whatever upon crew members to exclude either the master, the Coast Guard, or one another, from common areas such as the engine room, let alone from the interior of a structural beam. The master alone possesses such a right, as the fiduciary representative of the vessel owner. *See* 1 Norris, *supra,* at § 14:8. The crew's authority is *derivative* of the master's authority, and exercisable pursuant to the master's command or the command of his delegate or lawful successor. *See id.* at §§ 14:8, 25:16. As the Supreme Court stated in *Southern S.S. Co. v. N.L.R.B.,* 316 U.S. 31, 38, 62 S.Ct. 886, 890, 86 L.Ed. 1246 (1942), "[the master] must command and the crew must obey. Authority cannot be divided. These are actualities which the law has always recognized." [13].

Contrary to the majority's suggestion, a "reasonable expectation of privacy" on the part of the crew is neither reasonably inferable nor automatically enlarged simply by vir-

**11.** The secret compartment seems to have been situated so as to be accessible by means of a concealed "entrance way." Once the "entrance way" was unblocked, the packages of cocaine could be pulled from the hollowed-out beam by means of a string.

**12.** As the Court has stated time and again, the Fourth Amendment protects *individual* rights only, and no defendant may piggyback on a codefendant's expectation of privacy. *See United States v. Padilla,* —— U.S. ——, ——, 113 S.Ct. 1936, 1937, 123 L.Ed.2d 635 (1993) (rejecting Ninth Circuit view that "a co-conspirator obtains a legitimate expectation of privacy for Fourth Amendment purposes if he has either a supervisory role in the conspiracy or joint control over the place or property involved in the search or seizure"); *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969) (rejecting "derivative standing" for coconspirators under Fourth Amendment);

*Soule,* 908 F.2d at 1036–37 (same); *Bouffard,* 917 F.2d at 675–76 & n. 6 (tracing the successive demise of various theories of Fourth Amendment "standing," including "automatic," "derivative," and "target theory" standing).

**13.** Nor would the mere fact that the master may not have *exercised* his authority to control access to a particular area of the vessel mean that the crew possessed an "objectively reasonable expectation" that the master would not do so in the future. In any case, the burden of proof remains squarely *on the crew* to assert that the master has renounced such authority. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Bouffard,* 917 F.2d at 675 (quoting *Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978)). The record contains neither argument nor evidence suggesting an actual renunciation or delegation of the master's shipboard authority in this case.

tue of the small size and intimate nature of the vessel. An automobile is much smaller than a 43–foot fishing boat, yet automobile passengers, *qua* passengers, have no "reasonable expectation of privacy" even in the readily accessible contents of the glove compartment or the open area beneath the passenger seats. *See, e.g., Rakas,* 439 U.S. at 148–49, 99 S.Ct. at 433; *see also United States v. Lochan,* 674 F.2d 960, 965 (1st Cir.1982).

Finally, but not least importantly, these defendant crew members *never asserted* a reasonable expectation of privacy based on the size and intimate nature of the vessel. Under governing law, therefore, the record is wholly insufficient to suggest, let alone establish, that the warrantless search of the secret compartment in the structural beam intruded on a "legitimate expectation of privacy" of either crew member. *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430. The best that can be said is that, even assuming its validity, the theory of Fourth Amendment "standing" relied on by the court today is not implicated by the present record nor by the district court's ruling.[14]

The egalitarian concerns animating the court's ruling—that captain and crew deserve the same right to redress the challenged governmental intrusion—though foreclosed by precedent, are superficially compelling. As the court says, "the captain is the person most likely to be trusted with the knowledge of the presence of contraband, and is also the most likely leader of the criminal enterprise." Op. at 22 n. 6. Thus, for the challenged evidence to be ruled excludable at the behest of the captain, but not the crew, may appear unfair at first blush. But these concerns are illusory in the context of the appropriate Fourth Amendment inquiry: whether each individual crew member demonstrated a legitimate expectation of privacy in the invaded place or a proprietary or possessory interest in the evidence seized. The Fourth Amendment exclusionary rule simply is not designed to ensure "equitable" outcomes, but rather to safeguard expectations of privacy that society is prepared to recognize as reasonable.[15] To that end, the right to invoke the exclusionary rule is restricted to individuals who demonstrate an unlawful governmental intrusion upon an expectation of privacy that society is prepared to recognize as reasonable. *See Rakas, supra; Alderman, supra; see also* 4 Wayne R. LaFave, *Search & Seizure,* § 11.3(i) at 361 (2d ed. 1987) ("[g]uilty persons, of course, are sometimes acquitted as a consequence of the suppression [of unlawfully seized evidence], but to conclude that still other guilty persons must likewise be acquitted because joined in crime or trial with the first group is to bestow upon them a 'windfall to which they are not justly entitled.' ") (citation omitted).

I respectfully dissent from the holding that the Fourth Amendment rights of the defendant crew members were violated.

---

14. Since the government directly challenged defendants' "standing" below, a remand to permit the district court to consider the matter further would seem to be precluded. *Compare Combs v. United States,* 408 U.S. 224, 227–28, 92 S.Ct. 2284, 2286, 33 L.Ed.2d 308 (1972) (Per Curiam) (directing remand where prosecutor had not challenged defendant's "standing"), *with Rakas,* 439 U.S. at 130–31 n. 1, 99 S.Ct. at 424 n. 1 (refusing to remand where prosecutor had challenged "standing" at suppression hearing). *See also Bouffard,* 917 F.2d at 677–78.

15. Of course, the limited role and authority of crew members may at times be relevant to a "sufficiency of the evidence" challenge. *See, e.g. United States v. Steuben,* 850 F.2d 859, 869 (1st Cir.1988); *United States v. Bland,* 653 F.2d 989, 996–97 (5th Cir.1981), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981).