# United States Court of Appeals

## For the First Circuit

Nos. 07-1780, 07-2020

United States of America,

Appellee,

v.

FNU LNU, a/k/a Jimmy Oshunkey,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., District Judge]

Before

Lynch, Chief Judge,
Selya, Circuit Judge,
and Schwarzer,[*] District Judge.

Richard L. Goldman with whom Orlen & Goldman was on brief for appellant.

Thomas P. Colantuono, United States Attorney, with whom Aixa Maldonado-Quiñones, Assistant United States Attorney, was on the brief for the appellee.

October 10, 2008

[*]Of the Northern District of California, sitting by designation.

**Schwarzer, District Judge.**  On August 17, 2006, a jury convicted Defendant FNU LNU a/k/a Jimmy Oshunkey of furnishing false information to the Commissioner of Social Security in violation of 42 U.S.C. § 408(a)(6).  He appeals on seven grounds.  For the reasons discussed below, we find none to be meritorious and affirm the judgment.

## I. Factual and Procedural History

On September 9, 2005, defendant applied for a duplicate Social Security card at the Social Security Administration ("SSA") office in Lowell, Massachusetts.  The application listed his birth date as June 8, 1964, and his place of birth as Atlanta, Georgia. A SSA employee processing the application noticed discrepancies between the application and information in the SSA database.  SSA records indicated that the Social Security number in question had initially been issued to Sheyi Oshuwkeye[1], who was born on August 6, 1957, in Lagos, Nigeria. SSA employees asked for additional documentation, and the defendant provided a baptismal certificate, which was rejected as unofficial and generic.  The defendant was unable to provide other forms of documentation requested, such as a birth certificate and school records.

Unsuccessful in his effort to obtain a duplicate Social

---

[1]  The record reflects several different spellings of the defendant's name.  Although the SSA database uses the spelling of Oshuwkeye, we use Oshunkey, for consistency with the pleadings and the proceedings in the district court.

Security card from the Lowell office, the defendant went to the Nashua, New Hampshire SSA office on September 13, 2005, and again applied for a duplicate card. He did not disclose that he had applied and been declined for a duplicate card at the Lowell office. Like the SSA employee in Lowell, the employee in Nashua noted discrepancies between the application and SSA database and denied the defendant's application.

Some time later, Special Agent Michael Leonard of the SSA Inspector General's office was called in to investigate the possible submission of fraudulent applications by the defendant. Leonard attempted to arrange in person meetings with the defendant, but he failed to appear. He learned that the defendant had a post office box in Newtonville, Massachusetts. Working in collaboration with postal inspectors, Leonard monitored the defendant's incoming mail. He learned that the defendant received mail from the Doubletree hotel in Lowell and from a self storage facility in Billerica, Massachusetts. Leonard was not able to obtain the defendant's current contact information from the storage facility operator and contacted the Doubletree hotel. The hotel manager identified the defendant as a former employee, and agreed to ask the defendant to come to the hotel to pick up a check.

When he arrived at the hotel on December 15, 2005, the defendant was arrested and given Miranda warnings. He waived his rights, and spoke with Special Agent Leonard. He stated that he

could not recall his Social Security number and birth date, and also refused to say where he was currently living. He stated that his wallet was in his car, and gave permission for Leonard to search the car and its contents. The agents discovered a variety of forms of identification, including the baptismal certificate presented to the Lowell SSA office as well as other blank certificates. They recovered transcripts from the University of Massachusetts which reflected a birth date that was inconsistent with the information the defendant had supplied to the SSA. Additionally, the agents found several letters from Nigeria in the car that addressed the recipient as "Seyi", "brother" and "son". The defendant stated that he did not know the authors of the letters, and could not provide contact information for his parents.

While in jail following his arrest, the defendant was unable to continue making rental payments on his storage locker and went into default. The defendant apparently contacted the storage facility "to apprise them of his situation", but nothing in the record indicates that the storage facility agreed to excuse the payments due.

On May 16, 2006, personnel from the self storage facility contacted government agents and informed them that the defendant had not paid rent since December, 2005, and that the contents of the locker were to be auctioned off the next day. They offered to allow agents to search the storage locker.

- 4 -

The agents obtained a number of items in the search of the locker that were later offered in evidence at trial, including a transcript from Newbury Junior College that contained different birth dates and names than the defendant listed on his application for a duplicate Social Security card, a flyer entitled "AHow to Vanish - Start Life Over Again Under a New Identity," and additional correspondence from Nigeria. The defendant moved to suppress the items found in the search of the storage locker, but the motion was denied.

In his closing argument at trial, the prosecutor argued that the defendant was impersonating Oshunkey. He suggested that the defendant held on to the letters and other personal property so that he could "study up" on Oshunkey in order successfully to carry on the impersonation. Defense counsel made no objection. The defendant was convicted on one count of providing false information to the Commissioner of Social Security, in violation of 42 U.S.C. § 408(a)(6).[2] His motion for new trial was denied. He was sentenced to time served. This timely appeal followed.

---

[2] The indictment originally charged two counts. The first count, Fraud in Connection with Identification Documents, 18 U.S.C. § 1028(a)(7) & (c)(3)(A), was dismissed because the government failed to meet its evidentiary burden at trial.

## II. Discussion

### A.  Search of Storage Locker

The defendant contends that the district court erred in denying his Fourth Amendment challenge of the search of his storage locker.  We review the district court's legal conclusions de novo and its factual findings for clear error.  United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005).

To successfully challenge a search on Fourth Amendment grounds, the defendant must show that he had a subjective expectation of privacy in the place searched that is accepted by society as objectively reasonable.  Smith v. Maryland, 442 U.S. 735, 740 (1979); United States v. Cardona-Sandoval, 6 F.3d 15, 20 (1st Cir. 1993).  When evaluating whether a person has a reasonable expectation of privacy, courts examine a variety of factors, such as ownership of the premises, possession, access or control, ability to control or exclude others, and legitimate presence on the premises at the time of the search.  Cardona-Sandoval, 6 F.3d at 21.

In holding that the defendant did not have a protected Fourth Amendment right in the storage locker, the district court relied on United States v. Melucci, 888 F.2d 200, 202 (1st Cir. 1989).  In Melucci, this court held that a defendant did not have a reasonable expectation of privacy in his rented storage unit after he had failed to make multiple rental payments and the

storage facility operator had taken possession of the unit by removing the defendant's lock. Id. at 202. Other courts have held that individuals do not have standing to challenge a search of their rented storage locker based on similar facts. In United States v. Poulsen, the Ninth Circuit held that a defendant did not have a reasonable expectation of privacy in his storage locker when he defaulted on rental payments. 41 F.3d 1330, 1336-37 (9th Cir. 1994). The facility operator had a lien on the contents of the storage space under both the express terms of the rental agreement and California law. The court reasoned that the defendant lost his right of access to the space due to the lien, and thus no longer had a reasonable expectation of privacy. Likewise, in United States v. Abiodun, the court held that a defendant lost his reasonable expectation of privacy in a rented storage space when the facility operator imposed a lien, scheduled a public auction for the contents of the space, and removed the lessee's lock to allow government agents to conduct a search after the defendant defaulted on rental payments. No. 04-CR-1316 (D.C.) 2005 WL 3117305 at *3 (S.D.N.Y. Nov. 22, 2005).

We agree with the district court that the defendant lacked a reasonable expectation of privacy in the storage space at the time of the search. Testimony at trial established that the defendant had failed to pay rent on the storage locker for several months, and that the storage facility operator had a lien on the

contents of the locker, had scheduled a public auction, and had removed the lock on the space to permit the government agents to search the storage area.

Although a person's reasonable expectation of privacy is not defined by "arcane distinctions developed in property and tort law", Rakas v. Illinois, 439 U.S. 128, 143 (1978), the right to access the area searched is an important factor in the analysis. See United States v. Rawlings, 448 U.S. 98, 105 (1980). Under both Massachusetts law and the facility's rental policy, the defendant lacked the right to access the rented space. Massachusetts General Laws Chapter 105A, § 3 permits a storage facility operator to impose a lien on the contents of a storage space when the lessee defaults on rent. Section 5 further provides that:

> If an occupant is in default for a period of five days or more, the operator may deny the occupant access to the leased space in a reasonable and peaceable manner; provided however, that the occupant may have access at any time for the sole purpose of viewing the contents of his leased space in order to verify the contents therein.

Even apart from the provisions of Chapter 105A, the storage facility had a contractual right to exclude the defendant from the storage space. Trial testimony established that under the storage facility's rental policy, the manager of the facility had the right to lock the defendant out of the rented space if rent is more than five days overdue, and the storage facility treats a

- 8 -

locker as abandoned if rent is 60 days past due. Having lost his right of access, the defendant did not have a reasonable expectation of privacy in the storage space and lacked standing to challenge the search.

Defendant contends that his situation is distinguishable from Melucci and similar cases because, although his rent payments were overdue, he did not intend to abandon the space. He argues that he was unable to make rental payments after he was incarcerated, and that he contacted the storage facility manager to "apprise him of his situation". He contends that the lessee in Melucci not only failed to pay rent, but also did not contact the facility operator and thus intended to abandon the space. This attempt to distinguish Melucci is unconvincing. Regardless of the reason why the defendant could not continue to pay rent and his attempts to contact the storage facility operator, there is no evidence that the storage facility agreed to make any accommodation on account of the defendant's incarceration. Even if the defendant subjectively did not intend to abandon the locker after failing to pay rent, such a belief is objectively unreasonable and does not allow the defendant to challenge the search on Fourth Amendment grounds.

Defendant also points to Massachusetts General Laws Chapter 105A § 7, which provides that "except as otherwise provided herein or as stated in the rental agreement, the exclusive care,

custody and control of all property in the leased self-service space shall vest in the occupant until a lien sale under the provisions of this chapter." He argues that under this provision, he had a reasonable expectation of privacy in the locker until the auction, which was set to occur on May 17, 2006, one day after the agents searched the locker.

This argument is also unavailing. While § 7 states that a lessee has custody and control of belongings stored, it also provides that the lessee's rights are limited by other provisions of Chapter 105A and the terms of the rental contract. As noted above, both § 5 and the terms of the storage facility policy allow the storage facility operator to exclude a lessee who fails to pay rent. In light of the limitations on the defendant's right to control access to the storage locker, it is clear that defendant's reasonable expectation of privacy did not continue up until the time the lien sale.

## B. Alleged Error in the Prosecutor's Closing Argument

Defendant argues that the prosecutor's argument in his closing that the defendant was impersonating Mr. Oshunkey lacked an evidentiary foundation and contradicted the court's ruling that the purported impersonation was irrelevant. He claims that the argument resulted in prejudicial error and entitles him to a new trial.

Because defense counsel made no objection at the time of the closing argument, we review for plain error. United States v.

Anh, 523 F.3d 43, 55 (1st Cir. 2008).  In order to prevail, the defendant must show: 1) that there was an error, 2) that the error was clear or obvious, 3) that it affected the defendant's substantial rights, and 4) that it seriously impaired the fairness, integrity, and public reputation of the judicial proceedings. United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

Defendant bases his contention on the district court's evidentiary ruling excluding some of the blank certificates and forms found in the defendant's storage locker.  Rejecting the government's argument that the certificates were probative of its theory that the defendant was impersonating someone else, the court reasoned that the probative value of the certificates was substantially outweighed by their prejudicial effect.  The defendant contends that the prosecutor's subsequent statement about impersonation was contrary to the court's ruling and amounted to error.

The district court's evidentiary ruling did not bar the prosecution from introducing evidence and arguing that the defendant was impersonating someone else.  Indeed, at the time of the ruling, Count I of the indictment, which charged fraud in the connection with identification documents, had not yet been dismissed.  See supra note 2.  The government had to introduce evidence of fraud, such as impersonation, to meet its burden of proof on that count.

- 11 -

Further, the prosecutor's statements were not without evidentiary support. The defendant was unable to recall the Social Security number under which he was applying for a duplicate card, could not provide contact information for his parents, and stated that he did not know the authors of several letters found in his possession. Additionally, there were inconsistencies with regard to his date and place of birth contained in several records recovered from the defendant's car and locker. Based on the evidence admitted at trial, the jury could have properly inferred that the defendant was attempting to impersonate someone else. We find no error.

## C. Sufficiency of Evidence to Support Conviction

The defendant contends that the evidence was insufficient to support his conviction. A defendant challenging his conviction must demonstrate that, taking all the evidence in the light most favorable to the government, a reasonable jury could not have found that the prosecution successfully proved all elements of the crime beyond a reasonable doubt. United States v. Connolly, 341 F.3d 16, 22 (1st Cir. 2003).

In this case, a reasonable jury could have found that the prosecution met its burden on all elements of the crime and convicted the defendant. To support a conviction under 42 U.S.C. § 408(a)(6), the government must show 1) that the defendant furnished information to the Commissioner of the SSA he knew was

false, 2) that such information was furnished willfully, knowingly and with the specific intent to deceive the Commissioner as to his true identity, and 3) that the information submitted was required by the Commissioner of the SSA in order to issue a duplicate card. See 42 U.S.C. § 408(a)(6).

The defendant supplied a date and place of birth of June 8, 1964, in Atlanta, Georgia, on his application for a duplicate card. At trial, the government introduced two of the academic transcripts found in the search of his car and storage locker that reflected different dates and places of birth than those listed on the SSA application. A pamphlet entitled "how to vanish" and several blank marriage and baptismal certificates like the one presented to the Lowell SSA office were also introduced into evidence. In short, there was sufficient evidence for the jury to infer that the defendant submitted information to the SSA that he knew to be false.

Additionally, with regard to the second element, the jury could have found that submissions were made knowingly with the specific intent to deceive. The jury could have inferred the requisite intent based on the fact that, after his application had been rejected by the Lowell office, the defendant went to the Nashua SSA office to seek a duplicate card and did not inform them that he had recently been denied a card by the Lowell office. The defendant does not contest that the government met its burden on

- 13 -

the third element, that the documents were required to be submitted to receive a duplicate card. Because a reasonable jury could have found that the prosecution met its burden on all elements of the crime, there is sufficient evidence to sustain the defendant's conviction.

## D. Defective Indictment

Defendant contends that his indictment was defective because it did not specify what false information he allegedly submitted to the Commissioner of Social Security. We normally review the claims of defectiveness for harmless error. United States v. Mojica-Baez, 229 F.3d 292, 311 (1st Cir. 2000). Because the defendant failed to raise the objection prior to trial, however, he has waived his right to argue defectiveness of the indictment on appeal. Fed. R. Crim. P. 12(b)(3)(B).

Not withstanding the defendant's waiver, a review of the indictment reveals that it was not defective. It tracked the elements of the offense and stated the allegedly false information that the defendant attempted to use to obtain a duplicate Social Security card. See United States v. Serino, 835 F.2d 924, 929 (1st Cir. 1989)(stating that an indictment should apprise the defendant of the nature of the accusation and inform the court of the facts alleged).

## E.  Constructive Amendment of Indictment at Trial

Defendant argues his indictment was constructively

amended at trial because the district court allowed the government to introduce blank forms found in the search of the storage unit and because of the prosecutor's statements in his closing argument that the defendant was impersonating someone else.  He contends that this broadened the bases on which the jury could convict him to include identity theft or impersonation, rather than the more limited crime charged in the indictment.

In determining whether there has been constructive amendment of the indictment, we generally evaluate whether the defendant has demonstrated that "the alleged alteration in the indictment did in fact change the elements of the offense charged, and whether he was convicted of a crime not charged in the grand jury indictment."  United States v. Kelley, 722 F.2d 873, 876 (1st Cir. 1983).  Because the defendant failed to adequately raise this issue before the trial court, however, we review for plain error.  United States v. Brando, 539 U.S. F.3d 44, 57 (1st Cir. 2008).

Here, the introduction of the blank forms and the prosecutor's suggestion of impersonation neither altered the elements of the charged offense nor allowed the jury to convict him of an uncharged crime.  Under 42 U.S.C. § 408(a)(6), the government was required to prove that the defendant knowingly and willfully provided false information with the intent to deceive.  The blank forms and the prosecutor's theory that the defendant was impersonating someone else helped to establish that he had the

requisite mens rea to be convicted of the crime charged. That defendant possessed forms that he could freely fill in and was trying to use someone else's identity to obtain a duplicate Social Security card made it more likely that he could have provided the information on his SSA application with the intent to deceive.

## F. Denial of the Right to Testify

Defendant contends that the district court erred in denying his motion for a new trial because he was not permitted to testify in his own defense. We review the denial of a motion for a new trial for abuse of discretion. United States v. Montilla-Rivera, 115 F.3d 1060, 1064 (1st Cir. 1997). The district court's findings of fact are reviewed for clear error. Awon v. United States, 308 F.3d 133, 141 (1st Cir. 2002)(noting that the trial court's credibility determinations should be given special deference).

In this case, the district court held a hearing and considered testimony from both the defendant and trial counsel. The defendant testified that he did not knowingly waive his rights, and that he did in fact intend to testify in his own defense. Trial counsel testified that he informed the defendant of his right to testify and conducted a mock examination, and that the defendant decided against testifying. Further, trial counsel testified that he briefly conferred with the defendant during the course of the trial at which time he again indicated that he did not intend to

testify.  Crediting the testimony of trial counsel, the court found that the defendant had been adequately informed of his rights.  The district court's findings of fact were made after a full hearing, and are not clearly erroneous.  Based on these facts, the court did not abuse its discretion in denying defendant's motion for a new trial.

## G.  Sentence Enhancement

The defendant contends that the district court erred in increasing his offense level from 6 to 12 under U.S.S.G. § 2B1.1(b)(10)(C)(I)[3], based on a finding that he used a means of identification unlawfully to obtain another means of identification.  We review a sentencing court's findings of fact for clear error and afford de novo review to its resolution of questions of law.  United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007).  The district court did not err in enhancing the defendant's sentence under the Guidelines.  Although the defendant contends that there was no evidence he used a form of identification unlawfully to obtain a duplicate Social Security card, the jury's verdict on Count II established that defendant unlawfully used false means of identification to obtain another means of identification, i.e. a Social Security card.

---

[3] Section 2B1.1(b)(10)(C)(I) provides in relevant part:  "If the offense involves...the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification...increase by 2 levels.  If the resulting offense level is less than level 12, increase to level 12."

AFFIRMED.